**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (#134180)
Andy Sohrn (#241388)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

*Liaison Counsel*

**SCHOENGOLD SPORN LAITMAN**
**& LOMETTI, P.C.**
Samuel P. Sporn (SS-4444)
Joel P. Laitman (JL-8178)
Christopher Lometti (CL-9124)
Jay P. Saltzman (JS-7335)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046

*Lead Counsel for the Class*
*and Attorneys for the Lead Plaintiff New Jersey*
*Carpenters Pension and Benefit Funds*

FILED

JUL 07 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ per law clerk DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HCL PARTNERS LIMITED PARTNERSHIP, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> LEAP WIRELESS INTERNATIONAL, INC. S. DOUGLAS HUTCHESON, AMIN I. KHALIFA, GRANT A. BURTON, MICHAEL B. TARGOFF, JOHN D. HARKEY, ROBERT V. LaPENTA, AND PRICEWATERHOUSECOOPERS, LLP, <br><br> Defendants. | <u>**ECF CASE**</u> <br><br> **Case No.: 07-cv-2245 (BTM)** <br><br> **PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Hon. Barry Ted Moskowitz |



1

2  KENT CHARMICHAEL, Individually and on
   behalf of all others similarly situated,

3                                                    Case No.: 08-cv-0128

4                      Plaintiff,

5          v.

6  LEAP WIRELESS INTERNATIONAL, INC.,
   S. DOUGLAS HUTCHESON,

7  AMIN I. KHALIFA, GRANT A. BURTON,
   MICHAEL B. TARGOFF, JOHN D. HARKEY,

8  ROBERT V. LaPENTA, AND
   PRICEWATERHOUSECOOPERS, LLP,

9

10                     Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## **INTRODUCTION**

1.     This class action is brought on behalf of persons who purchased or otherwise acquired Leap Wireless International, Inc. ("Leap" or the "Company") securities between August 3, 2006 (the date Leap announced its financial results for the quarter-ended June 30, 2006) through November 9, 2007 (the date that Leap announced the restatement of its financial statements for fiscal 2004, 2005, 2006 and the first two quarters of 2007 (the "Restatement Period")), inclusive (the "Class Period") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"). The action is brought against Leap, its Chief Executive Officer ("CEO") and acting Chief Financial Officer ("CFO"), S. Douglas Hutcheson ("Hutcheson"); Vice President and Chief Accounting Officer ("CAO"), Grant A. Burton ("Burton"); Executive Vice President and Chief Financial Officer, Amin L. Khalifa ("Khalifa") (collectively the "Senior Executives" or "Management Defendants"); Leap's outside directors Michael B. Targoff ("Targoff"), John D. Harkey ("Harkey") and Robert V. LaPenta ("LaPenta"), who were members of the Audit Committee of Leap's Board of Directors (collectively the "Audit Committee Defendants"); and Leap's independent outside auditor, PricewaterhouseCoopers, LLP ("PwC").

2.     Defendants' misrepresentations and omissions, as alleged herein, artificially inflated Leap's common stock price, driving it from $40.87 per share to $98.33 per share during the Class Period. Specifically, Defendants caused Leap to report materially inflated service revenue, operating income and net income figures and to issue false assurances to investors that Leap's financial results fairly reflected the company's financial condition and conformed to generally accepted accounting principles ("GAAP"); contained no untrue statements of fact or

1  material omissions; and were supported by properly designed and effective internal accounting

2  controls. These inflated financial figures and false and misleading statements also masked full

3  disclosure of declining customer growth during the Class Period. The artificially induced 140%

4  increase in Leap's common stock price set the stage for a massive unloading of Leap common

5  stock by Leap insiders at peak prices: Leap insiders sold $61 million in Leap common stock at

6  between $67.32 and $88.34 per share between February 27, 2007 and July 27, 2007. Moreover,

7  it also triggered inflated bonus compensation to certain Management Defendants which was

8  based on the inflated Class Period financial results. (¶¶ 21-24, 198). When Leap finally began to

9  disclose its declining growth on August 7, 2007 and then fully disclosed on November 9, 2007

10 that its financial results had been inflated and its internal accounting controls had been deficient

11 during the Class Period, Leap's common stock price plummeted from $88.65 per share on

12 August 2, 2007 to $34.03 per share on November 12, 2007. The chronology of announcements,

13 price appreciation, insider sales, adverse disclosures and precipitous price declines is as follows:





3.      The amount of the material overstatement of Leap's operating income and net income during the Class Period pursuant to the Restatement are as follows:

| | | 2Q 2007 | 1Q 2007 | FY 2006 | 4Q 2006 | 3Q 2006 | 2Q 2006 |
|---|---|---|---|---|---|---|---|
| Operating Income: | Reported | $36,888 | $4,372 | $43,824 | ($9,508) | $17,002 | $16,452 |
| | Restated | $30,704 | ($1,543) | $23,725 | ($16,502) | $7,050 | $11,742 |
| | Difference | $(6,184) | $(5,915) | $(20,099) | $(6,994) | $(9,952) | $(4,710) |
| | % Overstated | 20.14% | 383.34% | 84.72% | 42.38% | 141.16% | 40.11% |
| | | | | | | | |
| Net Income: | Reported | $3,247 | ($8,123) | ($4,139) | ($39,352) | $9,979 | $7,510 |
| | Restated | $9,638 | ($24,224) | ($24,357) | ($45,637) | ($801) | $2,800 |
| | Difference | $6,391 | $(16,101) | $(20,218) | $(6,285) | $(10,780) | $(4,710) |
| | % Overstated | -66.31% | 66.47% | 83.01% | 13.77% | 1345.82% | 168.21% |

## II.

## BACKGROUND

4.      During the Class Period, through the retail outlets of its subsidiary Cricket Communications Inc. ("CCI"), Leap was engaged in the business of providing low cost wireless service to approximately three million subscribers throughout the United States. Leap services were offered through two types of payment plans: (1) prepaid service through its Jump Mobile brand ("Jump Mobile") for which subscribers purchased minutes on an as-needed basis and had the ability to "refill" their minutes at any time; or (2) "pay-in-arrears" plan, with a flat monthly fee, offered under the Cricket brand ("Cricket"), which included unlimited airtime for calls made within a limited local geographic calling area and required remittance of payment by subscribers only after receipt of a monthly bill.

5.      The relatively low cost of Leap's Cricket service, the absence of a requirement of any long term contractual commitment and the fact that customers were not subject to any credit check prior to activation of their service, resulted in Leap's attracting a transient, short-term and less affluent customer base. As set forth below, the nature of Leap's Cricket service subscriber base posed significant risks in terms of financial reporting of service revenue and income under GAAP. Additionally, under the Securities and Exchange Commission's Staff Accounting Bulletin ("SAB") 104, revenue is only to be recognized when there is persuasive evidence of an existing financial arrangement and when, *inter alia*, payment is reasonably assured. Customers with poor credit and with only a month-to-month commitment posed higher risks of non-payment (*i.e.*, no "reasonable assurance of payment" under SAB 104) and termination of service (*i.e.*, no existing evidence of a financial arrangement" under SAB 104).

6.     Faced with these reporting issues, Defendants took many steps to falsely allay any investor concerns.  First, Leap consistently and stated throughout the Class Period that it only recognized revenue "upon receipt of payment."  (¶¶ 77, 89, 123, 131).  Under this policy, it would not matter how uncreditworthy customers were, or whether they terminated service before billing or payment, because revenue would not be recorded or reported by Leap until it was in hand.  Second, Defendants Hutcheson and Khalifa filed quarterly and year-end certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 and 18 U.S.C § 1350, respectively ("SOX"), certifying that there were no material misstatements or omissions in Leap's reported financial results, that they had personally participated in the design and preparation of appropriate and adequate internal accounting controls, and that these controls were effective and contained no material deficiencies or weaknesses in either design or operation and that the financial reports conformed with GAAP.  (¶¶ 81-82, 94-95, 114-116, 127-128).  In addition, Leap told investors that its accounting functions and financial reporting were overseen by an active and "expert" Audit Committee whose duties included meaningful oversight of outside auditors and audit procedures and a meaningful review of the correctness and consistency in the reported financial statements of the Company with all information available to the Committee. (¶ 30).  Finally, following its audit of Leap's fiscal year 2006 financial statements, Defendant PwC issued a report to investors which both supported managements' assessment of Leap's internal controls and stated that, based on its audit under generally accepted auditing standards ("GAAS"), Leap's 2006 financial results conformed to Generally Accepted Accounting Principles ("GAAP") and fairly reflected the Company's financial condition. (¶¶ 160-170).

7.     With these false and misleading representations in hand, Leap proceeded to announce and report positive financial results during the Class Period particularly in terms of operating and net income for the second and third quarters of 2006, its fiscal year-ended December 31, 2006 and the quarters ending March 31, 2007 and June 30, 2007. (¶¶ 3, 151). These positive announcements caused the noted dramatic increase in Leap's common stock price (from $40.87 per share to $98.33 per share), which enabled Leap's senior management and Board of Directors to unload massive quantified of Leap common stock, reaping $61 million form sales of Leap's common stock at peak prices (between $67.32 per share and $88.34 per share between February 27, 2007 and July 27, 2007). (¶¶ 2, 197).

8.     Unfortunately for Leap's public (non-insider) investors, Leap's reported operating income and net income and assurances regarding its internal controls all were false. Leap had, throughout the Class Period, violated its stated revenue recognition policy by recognizing revenue for customers who had ceased using the Leap service. This had the effect of materially overstating reported operating and net income. Further, Leap well knew that the internal controls over the Company's financial reporting had long been materially deficient. (¶¶ 5-14, 45-49, 50-72, 154-170). In addition, the Audit Committee failed in its stated auditing and financial reporting duties and responsibilities and the outside auditor, PwC, failed to conduct a GAAS audit of Leap's 2006 financial statements and issued an unqualified report with respect to those financial statements when in fact they failed to comply with GAAP. (¶¶ 154-170).

9.     Defendants were well-aware of these improper practices during the Class Period. The Company's reported financial results were derived from an internal accounting application known as the ☐O Billing System (the "Billing System"). This system was operated out of Leap's San Diego offices but was linked to all retail Cricket outlets. When a customer signed-up for

Leap services, the subscriber's information and number would be entered into the Billing System. Thereafter, the customer's usage of airtime minutes would be tracked in the Billing System, as would the revenue being recognized from the subscriber's usage of Leap services. The Company also maintained, as required by the Federal Communications Commission ("FCC") of all cellular companies, an independent system that reflected when customers terminated Leap service or "ported" from the Leap service to another wireless or landline provider. This system was called the Provisioning System. The Provisioning System was a main-frame computer application located in San Diego but was accessible through Leap's sales centers throughout the country and Leap's customer service call centers located in Albuquerque, New Mexico, Phoenix, Arizona, Denver, Colorado and San Diego, California. When customers would call Leap to terminate service, the calls would be forwarded to the call centers and the termination of service would be entered into the Provisioning System. During the Class Period, Leap maintained *no link* or integration between the Provisioning System and the Billing System. (¶¶59-65). As a result, the termination of customer service in the Provisioning System was not reflected in the Billing System such that Leap continued to recognize revenue for customers who terminated Leap services. This fundamental "disconnect" in Leap's internal information systems was widely known to management, the Audit Committee and PwC throughout the Class Period.

10. Beginning in 2005, outside consultants were engaged to evaluate the Company's internal controls with respect to financial reporting. Grant Gray ("Gray"), a Leap operations manager in late 2005, directed an outside consultant (*i.e.,* Confidential Witness #1 ("CW#1") (¶ 45), engaged by Leap to examine and report to Leap's senior management (specifically, Defendants Hutcheson and Burton) about integration issues between the Billing System and the Provisioning System. During the course of performance of his work, CW#1 generated and

distributed Minutes Reports to managers and senior management which clearly documented that the HBS was recording "service revenue" for subscribers in periods for which those subscribers had used zero airtime minutes.  The red flag of active Cricket accounts which showed no usage of Leap's services was undeniable evidence that the customers in question – primarily persons of limited means who could ill afford to pay a monthly fee for a service they were not actively using – had terminated their Leap service.  These accounts had not been timely removed from the Billing System, resulting in improper revenue recognition.

11.    From April 2006 through February 2008, Leap engaged another outside accounting consultant, Confidential Witness # 2 ("CW#2") (¶ 46), manager of the team of consultants responsible for the cash and revenue reconciliation of the Company's Billing System metrics and cash receipts.  CW#2 was the manager of the cash and revenue reconciliation team ("CRRT").  The CRRT found and reported directly to Defendants Hutcheson, Khalifa and Burton (as well as to "Accounting Executives", including Gray, Ann Lu ("Lu"), Director of Financial Reporting Aaron Bergener ("Bergener"), Director of Internal Auditing Cathy Young ("Young") and accounting directors, managers and senior staff, including Sean Lawler ("Lawler"), CW#2, Confidential Witness #3 ("CW#3") and Confidential Witness #4 ("CW#4") (¶¶ 47-48) continued and systematic improper revenue recognition practices as reflected in Minutes Reports.  Leap's improper revenue recognition practices were further documented by the CRRT prepared reports showing the inability to reconcile "service revenues" recorded in the Billing System with the cash received by the Company.

12.    Further, CW#2 found that improper revenue recognition practices were being furthered by the improper practice of deferring "hot-lining" by subscriber account managers (in Leap's operations segment) who received incentive-based compensation measured by the end of

quarter subscriber account totals in their respective markets or regions. (¶ 46). Hot-lining is the the removal of subscribers who terminated wireless service from the Billing System. Throughout 2006 and 2007, account managers and supervisors responsible for the information recorded in the Billing System would delay the hot-lining of terminated subscribers until after the close of a quarterly or year-end reporting period. As a result of this practice, the Billing System would continue to include the subscriber in the current subscriber totals and, because of the Company's improper revenue recognition policy, continue to recognize revenue from subscriber after termination. CW#2 reported these findings to the Management Defendants, Accounting Executives, directors, managers and senior staff, including Lawler in 2006 and 2007. The findings of CW#2 were further reported to the Audit Committee in late 2006 and early 2007 by Senior Management, Accounting Executives, directors, managers and senior staff, including Young, Lu, Bergener, Gray and Lawler.

13.    Improper revenue recognition practices, as reflected in the Minutes Reports and failed reconciliations between recorded service revenues and actual cash receipts, were also discussed at mid-month review and at month-end pre- and post-close meetings, attended by CW#3 and Defendants Hutcheson and Burton. CW#3 also brought the evidence of improper revenue recognition in the Minutes Reports and financial reporting systems to the attention of PwC during the course of PwC's 2006 audit of Leap.

14.    Finally, between July and November 2006, CW#4 and Confidential Witness #5 ("CW#5") (a SOX compliance consultant engaged by Leap beginning in October 2006) (¶ 49) reported to Defendant Burton, as well as Young and Lu, deficiencies in the Company's internal controls as required by SOX, relating to the Company's recognition of service revenue and specifically identifying "short-cuts" being taken after removal of a subscriber from the

Provisioning System which deferred the removal of terminated subscribers from the Billing System. Monthly assessments detailing the Company's lack of internal controls and improper revenue recognition in 2006 were prepared by CW#4 and his team and were uploaded into the Company's Oracle Accounting Database and distributed to Leap management, directors, managers and senior staff, including the Management Defendants.

**III.**

**JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. § 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. The Company's headquarters are located within this Judicial District, located at 10307 Pacific Center Court, San Diego, California 92121.

18.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## IV.

## PARTIES

19.    Lead Plaintiff, The New Jersey Carpenters Pension and Benefits Funds (the "Carpenters Funds"), as set forth in its certification that accompanied it motion for appointment as Lead Plaintiff, incorporated by reference herein, purchased Leap common stock at artificially inflated prices during the Class Period and has been damaged by Defendants' actions, as alleged herein, when the price of Leap's shares plummeted upon revelation of the true facts.

20.    Defendant Leap is a Delaware corporation with its principal executive offices located in the State of California at 10307 Pacific Center Court, San Diego, CA, 92121. Leap is a wireless communications carrier which offers digital wireless services to its more than three million customers in the United States. The Company offers its wireless services through its wholly owned subsidiaries under the brands Cricket and Jump Mobile. As of the September 30, 2007, the Company's assets totaled more than $4 billion.

A.    **Management Defendants**

21.    Defendant Hutcheson, since February 2005, has served as Leap's CEO, President and as a Director of the Company. Hutcheson previously served as Leap's President and CFO from January 2005 to February 2005 and as Leap's executive vice president and CFO from January 2004 to January 2005. Hutcheson signed Leap's financial statements filed with the SEC during the Class Period, including the Form 10-K filings for fiscal year 2006, as well as Form 10-Q filings during the same fiscal year and for the first two quarters of fiscal 2007. (¶¶ 77-80, 89-93, 101-06, 111-13, 122-25, 131-33, 148-51, 152-53). During the Class Period, Hutcheson signed certifications pursuant to Sections 302 and 906 of the SOX, in connection with each of the relevant Form 10-Q filings and the 2006 Form 10-K all filed with the SEC, falsely stating

that there were no material weaknesses in internal controls and no material misstatement or omissions in the financial statements pertaining to the adequacy of the internal control over financial reporting related to the design of internal controls, preparation and review of account reconciliations and analysis of revenues, cost of revenue and deferred revenues. (¶¶ 81-82, 94-95, 114-16, 127-28). Hutcheson also participated on quarterly conference calls with securities analysts, which falsely conveyed Leap's financial condition and accounting controls. (¶¶ 85-87, 98-100, 120-21, 147).

22. Defendant Hutcheson had actual knowledge of or was deliberately reckless as to the false and/or misleading nature of these statements as set forth herein (¶¶ 76-137) as a result of meetings with outside consultants and Leap's managers (including mid-month and end of month pre- and post-close meetings where the material internal controls deficiencies and improper revenue recognition practices at the Company repeatedly were discussed (¶¶ 10-14, 44-49)), review of Minutes Reports generated on a daily, weekly and monthly basis documenting improper recognition of revenue (¶¶ 9-14, 59-62), review of cash reconciliation reports and data (¶¶ 11, 13, 80, 87, 110, 141, 147, 149) and review of monthly assessments of internal controls and compliance by outside consultants. (¶ 14, 48-49, 80, 87). In 2006, Hutcheson's compensation, including bonus and stock options, was "linked to specific" measurable financial results, including operating income and net customer additions. *See* Leap Wireless 2007 Proxy Statement, filed April 6, 2007, pp. 23-27. In 2006, Hutcheson received $3,232,021 in total earnings, including $541,346 in salary, $100,000 in bonuses, $721,701 in compensation under incentive plans and $1,568,974 in stock and option awards. In 2007, Hutcheson's total earnings increased to $2,074,185, including $610,385 in salary, $499,812 in compensation under incentive plans and $2,963,988 in stock and option awards. During the Class Period, Hutcheson, while in

possession of non-public material adverse information, sold 23,923 shares of Leap common stock at $67.32-$85.61 per share; reaping proceeds in excess of $1.9 million.  Hutcheson's stock sales during the Class Period were more than double the number of shares he sold in the year preceding the commencement of the Class Period.

23.    Defendant Burton served as Leap's Vice President, CAO and Controller since June 2005.  Burton signed Leap's financial statements filed with the SEC during the Restatement Period, including the Form 10-K filing for fiscal year 2006.  (¶¶ 101-04, 111-13).  Burton knew or with deliberate recklessness disregarded the falsity of these statements as set forth herein (¶¶ 76-137) as a result of meetings with outside consultants and Leap's managers (including mid-month and end of month pre- and post-close meetings where they disclosed material internal controls deficiencies and improper revenue recognition practices at the Company (¶¶ 10-14, 44-49)), review of Minutes Reports generated on a daily, weekly and monthly basis (¶¶9-14, 59-62), review of cash reconciliation reports and data (¶¶ 11, 13, 80, 87, 110, 141, 147, 149) and review of monthly assessments of internal controls and compliance by outside consultants. (¶¶14, 48-49, 80, 87).  In 2006, Burton's compensation, including bonus and stock options, was "linked to specific" measurable financial results, including operating income and net customer additions. *See* Leap Wireless 2007 Proxy Statement, filed April 6, 2007, pp. 23-27. During the Class Period, Burton, while in possession of non-public material adverse information, sold 665 shares of Leap common stock at $67.32 per share, reaping proceeds in excess of $44,500. Prior to the commencement of the Class Period, Burton had not sold a single share of his Leap common stock.

24.    Defendant Khalifa served as Leap's Executive Vice President and CFO since August 2006.  Khalifa signed Leap's financial statements, including Leap's false and misleading

Form 10-K filing for fiscal year-ended 2006, as well as Form 10-Q filings for the last two quarters of 2006 and the first two quarters of 2007. (¶¶ 89-93, 101-04, 111-13, 122-25, 131-33, 148-51, 152-53).   During the Class Period, Khalifa signed certifications pursuant to Sections 302 and 906 of the SOX, in connection with each of the Form 10-Qs and the 2006 Form 10-K filed with the SEC, falsely stating that there were no material weaknesses in internal controls and no material misstatements or omissions in the financial statements pertaining to the adequacy of the internal control over financial reporting related to the design of internal controls, preparation and review of account reconciliations and analysis of revenues, cost of revenue and deferred revenues. (¶¶ 81-82, 94-95, 114-16, 127-28).  In 2006, Khalifa's compensation, including bonus and stock options, was "linked to specific" measurable financial results, including operating income and net customer additions.  *See* Leap Wireless 2007 Proxy Statement, filed April 6, 2007, pp. 23-27.  In 2006, Khalifa received $697,588 in total earnings, including $115,385 in salary, $50,000 in bonuses, $136,414 in compensation under incentive plans and $395,789 in stock and option awards.  In 2007, Khalifa's total earnings increased to 2,088,399, including $274,039 in salary, $658,657 in compensation under incentive plans and $1,155,703 in stock and option awards.

25.     The Management Defendants had knowledge of or were deliberately reckless as to Leap's improper revenue recognition practices and undisclosed inadequate internal controls as a result of the following:

(a)     Beginning in 2005 and throughout the Class Period, the Management Defendants reviewed daily, weekly and monthly "Minutes Reports," which reflected that Company was recording and recognizing revenue for subscribers

that had terminated their wireless services and were no longer using the Leap system (¶¶ 59-72);

(b)    the Management Defendants were apprised by outside consultants throughout the Class Period (¶¶ 10, 45-49, 66-72, 75, 84, 104) of improper revenue recognition practices including as reflected by Minutes Reports (¶¶ 59-62) and cash reconciliation reports (¶¶ 11, 13, 80, 87, 110, 141, 147, 149);

(c)    the Management Defendants were apprised of specific improper practices of deferring of "hot-lining" (¶¶ 70-72) subscribers from the Billing System and "short-cuts" in removing subscribers from the Billing System (¶¶ 14, 48, 66-69, 80) resulting in improper financial reporting including the reporting of inflated service revenues throughout the Class Period (¶¶ 2, 46, 69-72, 106);

(d)    the Management Defendants were advised of improper revenue recognition practices and internal controls failures in the monthly assessments prepared by outside consultants and uploaded to Leap's Oracle Accounting Database used by Leap's reporting departments (¶ 14, 48-49, 80, 87);

(e)    Defendant Burton, as well as Young and Lu, attended weekly GAAP Assessment Meetings where the Company's internal controls deficiencies, including the failure to properly and timely "hot-line" subscribers at the end of monthly and quarterly periods, were discussed with operations and accounting managers and internal reporting departments, including CW#2 and CW#3's departments of financial reporting and cash reconciliation (¶¶ 46-47); and,

(f)    the SOX Testing Reports which detailed Leap's non-compliance with SOX relating to the Company's financial reporting of revenue and subscribers and

its internal controls, which were prepared by CW#5 were provided to Accounting Executives, Defendant Burton and to PwC in connection with its audit of Leap's 2006 fiscal year financial statements (¶ 49).

**B.    Audit Committee Defendants**

26.    Defendant Targoff has served as a member of Leap's Board of Directors since September 1998. Targoff was also chairman and a member of the Audit Committee and had direct responsibility for reviewing Leap accounting policies and practices and overseeing the outside auditor, PwC. In 2006, Targoff received $421,714 in total compensations, including $55,000 in fees earned or paid in cash, $20,712 in stock awards, and $346,002 in option awards. During the Class Period, Targoff, while in possession of non-public material adverse information, sold 35,000 shares – or 90.97% of his total holdings in Leap common stock – at $83.52 per share, reaping proceeds in excess of $2.9 million. Prior to his sale on June 6, 2007, 2007, Targoff had not previously sold a single share of his Leap common stock.

27.    Defendant Harkey has served as a member of Leap's Board of Directors since March 2005. Harkey was also a member of the Audit Committee and had direct responsibility for reviewing Leap accounting policies and practices and overseeing the outside auditor, PwC. In 2006, Harkey received $110,261 in total earnings, including $40,000 in fees earned or paid in cash, $20,712 in stock awards, and $49,549 in option awards.

28.    Defendant LaPenta has served as a member of Leap's Board of Directors since March 2005. LaPenta was also a member of the Audit Committee and had direct responsibility for reviewing Leap accounting policies and practices and overseeing the outside auditor, PwC. In 2006, LaPenta received $110,299 in total earnings, including $40,000 in fees earned or paid in cash, $20,712 in stock awards, and $49,587 in option awards.

29.    The Management Defendants and the Audit Committee Defendants are referred to herein collectively as the "Individual Defendants."

30.    Investors were falsely advised that each Audit Committee Defendant was an "audit committee financial expert," as the term is defined in the rules and regulations established by the SEC. According to Leap's 2006 and 2007 Proxy Statements, the functions of the Audit Committee were:

- appointment, compensation, retention and oversight of our independent registered public accounting firm and senior internal audit executive;
- pre-approval of audit and non-audit services to be rendered by our independent registered public accounting firm;
- review of the independence and quality control procedures of our independent registered public accounting firm and the experience and qualifications of the senior personnel from our independent registered public accounting firm providing audit services to us;
- meeting with our management, our independent registered public accounting firm and our senior internal audit executive to discuss: (i) each annual audit, major issues regarding accounting principles and financial statement presentations, complex or unusual transactions, and other special financial issues; (ii) analyses prepared by management or the independent registered public accounting firm of significant financial reporting issues and judgments made in connection with the preparation of our financial statements; and (iii) the effect of recent regulatory and professional accounting pronouncements and off-balance sheet structures on our financial statements;
- reviewing our financial statements and periodic reports and discussing these statements and reports with our management and our independent registered public accounting firm, and considering whether such statements and reports are complete and consistent with information known to Audit Committee members; and
- meeting separately with representatives from the independent registered public accounting firm: (i) regarding any problems or difficulties encountered during the course of the audit work; (ii) to discuss the report the independent registered public accounting firm is required to make to the Audit Committee; and (iii) to discuss the matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees."

Leap Wireless 2006 Proxy Statement, filed April 12, 2006, p. 4; *see also*, Leap Wireless 2007 Proxy Statement, filed May 17, 2007, pp. 4-5.

31.    The aforementioned statements of duties misled investors because the Audit Committee (which according to the Company's 2006 Proxy Statement, the Audit Committee held seven meetings during 2006), as set forth herein, permitted the issuance of materially false financial results and false statements regarding the design and effectiveness of Leap's internal controls with respect to Leap's financial reporting. (¶¶ 76-137).  The Audit Committee knew or was deliberately reckless as to the falsity of these statements and the falsity of Defendant PwC reports regarding Leap's 2006 financial statements and internal controls (¶¶ 154-191) because throughout the Class Period the Audit Committee Defendants were apprised of:

(a)    Leap's engagement beginning in 2005 and throughout the Class Period of outside consultants to address internal control problems in financial reporting. (¶¶ 10-14, 45-49, 59-72, 75, 84, 104);

(b)    improper revenue recognition practices as reflected in Minutes Reports and reports of failed reconciliation of Billing System "revenue" with cash receipts. (¶¶ 11, 13, 59-72, 80, 87, 110, 141, 147, 149);

(c)    fundamental internal control deficiencies in the operations of the Billing System and its integration, or lack of integration, with the Provisioning System. (¶¶ 59-65); and,

(d)    the assessments uploaded to the Oracle Accounting Database by the outside compliance and auditing consultants disclosing improper revenue recognition and fundamental internal controls weaknesses and deficiencies. (¶¶ 14, 48-49, 80, 87).

32.    During the Class Period, each of the Individual Defendants, as Senior Executives and/or Directors of Leap, were privy to non-public information concerning its business, finances,

products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, these Individual Defendants had knowledge of or were deliberately reckless as to the adverse facts specified herein, that had not been disclosed to, and were being concealed from, the investing public.

33. As alleged herein (¶¶ 21-32), as officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ Stock Market ("NASDAQ") and the Over-The-Counter Market ("OTC") and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**C.     Auditor Defendant – PricewaterhouseCoopers**

34. Defendant PricewaterhouseCoopers, LLP ("PwC") is an international firm of certified public accountants, with offices in San Diego, California. PwC was Leap's outside auditor since as early as 2000, including the period of time that Leap was in bankruptcy (April 2003 through August 2004). PwC provided Leap with an unqualified opinion in connection with

Leap's consolidated balance sheets and the related consolidated statements of operations, of cash flows and of stockholders' equity (deficit) and the results of Leap's operations and cash flows for the year ended December 31, 2006, all of which falsely represented the Company's financial condition. PwC also conducted contemporaneous reviews of Leap's quarterly financial statements during the Class Period. In its unqualified audit report, PwC certified that (i) it audited Leap's financial statements in accordance with GAAS; (ii) it had planned and performed those audits "to obtain reasonable assurance about whether the financial statements are free of material misstatement"; (iii) in its opinion, Leap's financial statements were "in conformity with accounting principles generally accepted"; and (iv) its audits provided a "reasonable basis" for its opinion.

35. In connection with its fiscal 2006 audit, PwC performed a review of Leap's financial results and concluded that from the period December 31, 2004 through September 30, 2006, Leap exhibited material weaknesses in its internal control over financial reporting *limited* to the following two areas: (i) the application of GAAP in complex and non-routine transactions; and (ii) accounting for income taxes. However, as evidenced by Leap's 2007 Restatement, PwC's audit was materially flawed, so as not to amount to an audit at all, given that Leap finally admitted that there were additional previously undisclosed internal control material weaknesses as of December 31, 2006, including "deficiencies in [Leap's] internal controls over the existence, completeness and accuracy of revenues, cost or revenues and deferred revenues."

36. The Auditor Defendant knew or with deliberate recklessness disregarded clear and specific information and red flags that Leap, throughout the Class Period, engaged in improper revenue recognition practices in violation of GAAP (and Leap's stated revenue

recognition policy) and that Leap suffered from material weaknesses in its internal controls relating to its financial reporting. These included the following that:

    (a)    revenue and related financial reporting was a particularly high risk area for Leap given its subscriber base and thus should have warranted a detailed review and analysis in the audit of Leap's 2006 financial statements under GAAS;

    (b)    the Company hired outside accounting, auditing and technical consultants in beginning in 2005 to fill crucial voids in the Company's execution of daily accounting and compliance functions, including in the areas of SOX compliance and internal controls relating to Leap's financial reporting (¶¶ 50-56, 154-191);

    (c)    PwC was advised by Defendant Burton and Accounting Executives Lu and Young of material weaknesses in Leap's financial reporting, internal controls and improper revenue recognition practices as presented to them by outside consultants throughout the Class Period (¶¶ 11, 13, 59-72, 80, 87, 110, 141, 147, 149);

    (d)    PwC was provide with SOX assessments and 404 Compliance Reports (or SOX Testing Reports) prepared by CW#4 and CW#5 and their team of consultants, which appraised PwC of material weaknesses in Leap's internal controls and improper revenue recognition policy of improper revenue recognition practices throughout the Class Period (¶¶ 48-49);

    (e)    The SOX Testing Reports and assessments, including those prepared by CW#4 and CW#5, provided to the PwC audit team in connection with its audit of Leap's 2006 fiscal year financial statements, detailed Leap's non-compliance with

SOX relating to the Company's financial reporting of revenue and subscribers and its internal controls deficiencies (¶¶ 48-49);

(f)     there was no integration between Leap's Billing System and Provisioning System which was required for effective and accurate financial reporting (¶¶ 45-49, 59-65);

(g)     Leap's daily, weekly and monthly Minutes Reports documented the improper revenue recognition practices at the Company (¶¶ 10-14, 45-49, 59-65); and,

(h)     PwC was provided assessments by outside auditing consultants which detailed improper revenue recognition and material undisclosed internal control defects and weaknesses and had been uploaded into the Oracle Accounting Database (¶¶ 14, 48-49, 80, 87).

37.     Each of the Defendants is liable as a participant in a fraudulent course of conduct that operated as a fraud or deceit on purchasers of Leap securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  Defendants (i) deceived the investing public regarding Leap's business, operations, management and the intrinsic value of Leap securities; and (ii) caused Plaintiff and other members of the Class to purchase Leap securities at artificially inflated prices, only to be injured when the stock's price plummeted upon the revelation of the true facts.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Leap between August 7, 2006 through November 9, 2007

(the "Class Period"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Leap's securities were actively traded on the NASDAQ and OTC markets. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

42.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the

Class Period misrepresented and/or omitted material facts about the business, operations and management of Leap; and,

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

43.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.

## PERCIPIENT WITNESSES

44.    The sources for the factual allegations herein included the following material Confidential Witnesses (generally referred to as "CWs").

45.    CW#1 was an information technology consultant employed by Leap during July 2005 through November 2005. During this period, CW#1 was physically located at Leap's San Diego headquarters. CW#1's principle responsibilities were in the area of ensuring customer porting processes – activation/termination of subscriber wireless service and corresponding entry/removal of subscribers from the Billing System – were properly effectuated by Leap. During the course of the engagement, CW#1 came to understand – something known throughout the Company – that there was a fundamental lack of integration between the Provisioning System and the Billing System. As part of his duties, CW#1 was directed by the Company, including Grant Gray in his capacity as a director during CW#1's employment, to generate

Minutes Reports at regular daily, weekly and monthly intervals which contained numerous instances in which a subscriber service revenue was inconsistent and conflicted with airtime usage and/or payments on the subscriber's account.   These Minutes Reports provided ·clear evidence to Defendants Hutcheson and Burton and Accounting Executives, including Young, Lu, Bergener and Gray, of the material deficiencies in the Company's recognition of service revenue and calculation of subscriber totals.

46.    CW#2 was an outside accounting and auditing consultant engaged by Leap in April 2006 through February 2008.  While engaged at Leap, CW#2 physically worked at Leap's San Diego headquarters serving as the head of the Cash and Revenue Reconciliation Team ("CRRT").  In this position, CW#2 found systematic improper practices of revenue recognition – *i.e.,* recognition of revenue where cash had not yet been received – and discrepancies between revenue recognized, airtime usage and the Company's bank account for cash receivables.  CW#2 also found that Leap's account managers and supervisors in the Company's operations segment – who were responsible for the handling of subscriber accounts, and who were compensated based, in part, on monthly subscriber and service revenue totals – had engaged in improper deferral of hot-lining subscribers at the end of each reporting period, essentially deferring the removal of terminated subscribers from the Billing System until after the figures for the period had been finalized, which effectively inflated service revenue and total subscribers figures.   CW#2 reported these problems directly to Defendants Hutcheson, Khalifa and Burton, as well as to Accounting Executives, including Young, Lu, Gray and Bergener, and directors and managers, including Lawler and CW#3.  CW#2 advised Lawler of the improper accounting practices and internal control failures so that Lawler could then report the findings to the Management and Audit Committee Defendants at Executive Audit Committee meetings in 2006 and 2007.  ·

47.     CW#3 was an accounting and auditing consultant engaged by Leap from November 2006 through February 2008.  CW#3 was a CPA with more than twenty years of experience in financial reporting and accounting.  CW#3 was physically located at Leap's San Diego headquarters in Leap's accounting segment.  CW#3, serving in a consultant capacity, held several positions in the accounting segment at Leap (including a position as high up as director overseeing the Company's financial accounting functions in late 2006/early 2007).  CW#3 worked with both Leap's accounting staff and management as well as with the Leap's outside auditor, PwC, in connection with financial reporting functions throughout the Class Period, the preparation and audit of Leap's 2006 financial statements by PwC and the Restatement announced publicly in November 2007.  In particular, CW#3 was involved with analyzing financial statements regarding Leap's deferred revenue accounting in 2006 and early 2007.  During the Class Period, CW#3 attended regular monthly meetings with Defendants Hutcheson and Burton, which were also attended by Young, Lu, Gray and Bergener.  In connection with the year end and fiscal 2007 quarterly financial statements, CW#3 brought to the attention of Young, Lu, Gray and Bergener the discrepancies between service revenues and subscriber airtime usage, as reflected in the Minutes Reports, as well as discrepancies between recognized revenue and the "cash" actually received for the provision of services in the Company's single bank account for cash receivables ("cash receipts").  These discrepancies were brought to the attention of PwC during the course of the audit of Leap's 2006 financial statements.  CW#3 also attended "mid-month review" meetings and "month-end" (pre- and post-close) meetings with Defendants Hutcheson and Burton throughout 2006 and 2007.  The above discrepancies were also found throughout the 2006 and 2007 period of CW#3's Leap engagement and were communicated by CW#3 to Hutcheson and Burton at the mid-month and month-end meetings.  CW#3 also

appraised Lawler, a general accounting manager at Leap, of these discrepancies – Lawler then reported them directly to the Audit Committee.

48.    CW#4 was part of an outside accounting and audit consulting firm engaged by Leap. CW#4 was physically located at the Company's San Diego headquarters from July 2006 to November 2006 and worked in the areas of SOX compliance and internal controls throughout this period (CW#4's consulting firm – but not CW#4 specifically – had been engaged by Leap beginning in 2005). CW#4 was a CPA and certified internal auditor ("CIA"). CW#4 worked with and reported directly to Defendant Burton, as well as Young and Lu. CW#4 found and reported to Young, Lu and Burton that the combination of: (i) the Company's lack of integration between the Provisioning System and Billing System; (ii) employee short-cuts in the porting process; and (iii) the lack of any uniform procedures in operations and insufficient supervision of accounting personnel, resulted in a complete failure of the Company's internal control structure and in inconsistencies in Leap's financial reporting. (¶¶ 59-72). CW#4 and other members of his consulting group also prepared monthly assessments of the Company's internal controls and compliance. These assessments were uploaded into the Oracle Accounting Database, to be disseminated and provided to Senior Management, including Hutcheson, Khalifa and Burton. (¶¶14, 48-49, 80, 87).

49.    CW#5 was an outside auditing consultant engaged by Leap at its San Diego facility between October 2006 and early 2007. CW#5 worked at Leap in the areas of Risk Assessment and SOX Compliance Testing. During the Class Period, CW#5 performed SOX Compliance Testing on the Company's internal reports and reporting procedures, and consistently found material deficiencies and weaknesses in the internal controls and reporting at the Company. CW#5's review of Leap's internal controls was documented in SOX Testing

Reports, which set forth the report tested, the method in which it should have been prepared, the method in which it actually was prepared and whether or not the report passed or failed SOX compliance. CW#5 found, upon testing of the Company's Minutes Reports, that managers had improperly deferred removal of subscribers who had terminated service before the close of monthly and quarterly period until after the numbers for the period had been reported to management at the close of the period. CW#5 reported that this misconduct rendered the Company non-compliant with SOX rules and requirements relating to internal controls in public companies. CW#5 reported these findings directly to Defendant Burton and Assistant Controller Lu and Director of Internal Auditing Young on a weekly basis, as well as to the managers of the departments responsible for preparation of the reports tested. Moreover, CW#5's reports regarding Leap's SOX non-compliance during the Class Period were provided to Defendant PwC for its review in connection with its audit of Leap's fiscal year 2006 financial statements.

## VI.

## SUBSTANTIVE ALLEGATIONS

**A.    Leap's Transient Customer Base Mandates Rigorous
        Revenue Recognition Controls and Procedures**

50.    Leap currently provides wireless services to approximately 2.9 million subscribers throughout the United States. Leap provides these services through retail outlets owned and operated through its wholly-owned operating subsidiary CCI. CCI maintains retail stores, dealerships, call centers and a web-based portal where can consumers sign up for wireless services under either the "Cricket" or "Jump Mobile" brand names.

51.    Leap's business model differs from larger, more well-known wireless carriers, such as AT&T, Sprint or Verizon, in that Leap does not require a long-term contractual commitment from its customers and, more significantly, does not require a credit check prior to

sign-up. Leap offered two types of payment plans. Through its Jump Mobile brand, Leap allows subscribers to purchase pre-paid minutes via in-store kiosks or over the Internet. Jump service is completely pre-paid and once the customer's minutes are used, the customer must "refill" their account.

52.     Leap also offered wireless services within limited geographic areas for a low flat monthly fee, a pay-in-arrears plan through its Cricket brand. Upon activation and entry of a new subscriber into the Billing System, Leap would issue a bill and set a "statement date" in the Billing System system. A subscriber would continue to use its phone as long as payment was remitted to Leap prior to the end of that billing cycle. Once a new cycle started, a new bill would be issued. The Cricket plan was attractive due to its fixed monthly rate, no additional charges, and unlimited monthly usage within the local Cricket geographic calling area.

53.     Leap's business model targeted low-income subscribers in urban metropolitan areas who were young and who otherwise would not be able to pass a credit check or could not afford a full commitment plan from one of the larger national wireless carriers.

54.     The "month-to-month" nature of its Cricket service plan and the less affluent and economically unstable nature of Leap's subscriber base meant that there was high customer turnover rate or "churn rate" (monthly percentage of customers terminating service as compared to the total subscriber base). As a result of this heightened fluidity in its subscriber base, it was essential that Leap maintain both clear revenue recognition policies and rigorous internal controls which accurately tracked the Company's gains and losses in subscribers and revenue.

55.     Defendants adopted and publicly disclosed a revenue recognition policy which made clear that no revenue would be recognized until it was earned and payment had been received. Leap assured investors, in its fiscal year 2006 Form 10-K, that: *"service revenues are*

recognized only after services have been rendered and payment has been received." Leap Wireless 2006 Form 10-K, p. 47. Thus, while Leap offered two different kinds of payment plans to its customers – pay in advance (Jump Mobile) and pay in arrears (Cricket) – for financial reporting purposes, there was no difference to investors since under the stated policy, only money received would be recorded as revenue.

56.     As set forth below (¶¶ 77, 89, 123, 131), Leap violated its stated revenue recognition policy throughout the Class Period because, in fact, Leap's billing systems regularly recognized revenue before payment was received and even after the customer disconnected its Leap service.

**B.**     **Leap's Undisclosed Materially Deficient Internal Controls And False Financial Reporting**

1.     **Leap's Corporate Structure And Hierarchy**

57.     Leap is headquartered in San Diego, California, and is divided up into three separate segments: accounting, operations and marketing. The accounting segments were divided up further into individual departments, *i.e.*, billing, accounts receivable, accounts payable, compliance, reporting and revenue reconciliation and assurance. Operations was also divided up into departments by subscriber market and region.

58.     Senior Management, including Management Defendants Hutcheson, Khalifa and Burton, oversaw each of these segments. Senior management reported directly to the Board of Directors, specifically concerning accounting matters, to the Audit Committee. Accounting Executives, including Young, Lu, Bergener and Gray: (i) reported directly to Defendants Hutcheson, Burton and Khalifa and (ii) directed the work performed by directors, managers (accounting department heads), senior staff, such as Lawler and CW#2 and CW#3 (¶¶ 46-47), and outside consultants, including CW#1 and CW#4. (¶¶ 48-49).

### 2.    Leap's "HO Billing System"

59.    Leap's financial reporting was derived from its Billing System, developed by Verisign, Inc. ("Verisign") in the late 1990's. The Billing System was utilized by the Company to record and maintain subscriber metrics, account information and numbers, billing information and any relevant notes made by Leap employees. The Billing System was a main-frame billing and revenue recognition accounting application located and maintained at Leap's San Diego headquarters. It was accessible to Leap's Cricket dealerships, sales/service kiosks and web-portals around the country for the purpose of entering and accounting for all subscriber transactions and tracking subscriber base and revenue.

60.    When a new subscriber would purchase a phone and open an account at a local Cricket dealership, a dealer, customer service representative or sales manager would manually create a new billing account, and request entry of the subscriber into the Billing System by a Leap service center team member. If that customer was a current subscriber of another wireless carrier, a separate request was first made to the "porting" department to request transfer of that subscriber's telephone number and information to Leap's Provisioning System (details regarding "porting" and Leap's Provisioning System are set forth below at ¶¶ 63-65). After the subscriber's number was successfully "ported," a customer service representative at one of Leap's service centers was required to manually create a new subscriber account and add necessary subscriber information into the Billing System in order for Leap to begin recording and tracking revenue and usage for that subscriber. When a subscriber was "ported" out of Leap's system, effectively terminating its wireless service and being removed from the Provisioning System, a manual entry in the Billing System was necessary in order to halt Leap's recognition and tracking of airtime usage for that subscriber.

61.    Daily, weekly and monthly Minutes Reports generated by the Billing System set forth the Company's real-time financial metrics as functions of customer airtime usage and service revenue.  These Minutes Reports were used to break down Leap's financial performance by region, market or specific geographic area in terms of subscriber base, detailing account numbers, airtime usage and service revenue.  The Billing System regularly generated internal reports setting forth current and projected metrics (*i.e.,* service revenues, subscriber totals and airtime usage) which were distributed directly to the Management Defendants, Accounting Executives and directors on a daily, weekly and monthly basis.  In addition, the reports were distributed to various accounting departments, including cash and revenue reconciliation, financial reporting and compliance, on weekly basis.

62.    Daily Minutes Reports were shorter, less detailed summaries which provided the Senior Executives such as Hutcheson, Burton, Glenn T. Umetsu ("Umetsu"), Dean M. Luvisa ("Luvisa") and Khalifa with a daily snap-shot of the Company's subscriber totals and service revenue.  Weekly and monthly Billing System reports were more detailed, and included a specified sampling data from newly launched and existing markets, entire coverage areas and geographic regions in which Leap provided service. These reports were distributed to the Management Defendants noted above, as well as directors, managers, senior staff and Accounting Executives, including Young, Lu, Bergener, Gray, Lawler, and CW#3.  The weekly reports would be the subject of mid-month operations review meetings attended by the department directors, including CW#3 and Senior Executives Hutcheson, Umetsu and Burton, as well as the Accounting Executives, including Young, Lu, Gray and Bergener and Leap senior staff and managers, including Lawler and CW#2 and CW#3.

### 3.    Leap's Provisioning System

63.    Leap's Billing System operated separately and independently from Leap's computerized system which assigned a phone number to a wireless subscriber and activated wireless service. This computerized system was referred to as the "Provisioning System." The Provisioning System's main function was to ensure that Leap maintained compliance with FCC regulations, namely that Leap would be able to maintain integration of its business and customers with the rest of the wireless telecommunications industry.

64.    For Leap to compete in the wireless telecommunications market, it had to be able to seamlessly integrate new customers switching over their existing phone number from another service provider, and vice versa. The process of transferring an existing phone number from one phone service provider to another is commonly referred to as "porting." Local number portability ("LNP") refers to the ability to transfer an existing fixed-line (or "land-line") from one local telephone service carrier to another separate carrier. LNP was mandated by the FCC in 1996. Full mobile number portability ("FMNP") refers to the same process, but for mobile phone lines instead of fixed land-lines. In the United States and Canada FMNP is referred to simply as "WLNP" signifying "Wireless LNP."

65.    As set forth above, due to the nature of the Company's business model, its target demographic and fluidity of its subscriber base, part of Leap's day-to-day operations included the act of "porting" telephone numbers to and from other carriers. Porting was the responsibility of the LNP managers, who oversaw an entire department assigned to process porting requests forwarded by customer service centers and sales representatives. Porting was a detail-specific multi-step process that when properly executed would transfer a subscriber's the phone number into or out of Leap's Provisioning System and remove that customer from the Billing System.

**4.**     **Outside Consultants Find And Report That Leap Directed "Short-Cuts" In Porting-Out Subscribers From The Billing System Resulting In Improper Revenue Recognition**

66.     Porting was a time-consuming process that Leap was obligated to perform, but for which it could not pass costs along to its customers. Particularly, "porting out" a subscriber to another service carrier required Leap to use considerable time and resources due to the lengthy process and amount of requests, only to result in termination of a revenue stream. In order to keep costs down and timely facilitate subscriber "port out" requests, Leap encouraged and authorized its employees to take shortcuts which allowed Leap to transfer subscriber phone numbers out of the Provisioning system, but not out of the Billing System. For example, upon transfer of a phone number to another carrier's network in the Provisioning System, Leap would manually program the Billing System to suspend mailing a bill to that customer for the following billing cycle, but not spend the additional time to remove the record of the subscriber from the Billing System. As a result, while the subscriber was no longer receiving service or a monthly bill from Leap, the Billing System continued to accrue revenue from that customer and include this "ported out" customer in Leap's subscriber and revenue metrics. Leap engaged in these short-cuts despite the fact that in order to keep accurate records of subscriber totals and service revenues, porting should be completed in one fluid process.

67.     Throughout 2006 and 2007, CW#1 and CW#4 regularly reported to the Management Defendants that these short-cuts resulted in two common discrepancies in the Minutes Reports: accounts with no associated phone number due to the fact that the customer's number had been ported out by the LNP department but never removed from the Billing System – resulting in an overstatement of subscriber totals; and billing accounts that had associated phone numbers from which Leap was recognizing revenue, but yet had no user activity or

PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT
36

minutes – resulting in an overstatement of revenue. (While Leap was entitled to collect a flat fee on Cricket accounts regardless of the number of minutes used, the fact that *no* minutes were used *at all* was very strong evidence that the customer had churned off service and would never remit payment on continuing monthly bills for "service" the customer was no longer utilizing.)

68.     During their relevant engagements at Leap throughout 2006 and into 2007, CW#3 and CW#4 regularly encountered the inconsistencies in financial figures that resulted from these short-cuts in the porting process. Upon inquiring of the subscriber account managers, LNP operations managers and operations supervisors as to the underlying causes of these inconsistencies, they were informed that they and other operations personnel were encouraged by the Accounting Executives, at the direction of Defendants Burton, Hutcheson and Khalifa, to take these short-cuts in porting.

69.     According to confidential witnesses, this process created havoc in 2006 and 2007 for financial reporting and reconciliation departments. In turn, as set forth below, between 2006 and 2007 directors, managers and senior staff affected by these improper practices and failure in controls, including CW#2, CW#3 and Lawler, directly raised the issues with Senior Management, specifically Hutcheson, Khalifa and Burton, in mid-month, month-, quarter and year-end reviews and meetings.

**5.      Outside Consultants Find And Report Defendants' Improper Practice of Deferring of "Hot-Lining" Subscribers At Month, Quarter and Year-End**

70.     Because Leap's business model was premised on providing unlimited wireless service at a set price, the more customers Leap added from period to period – and the fewer customers they lost over that same period – dictated how well the Company was performing.

71.     As such, according to confidential witnesses, specifically CW#2 and CW#4, a systematic scheme of delaying all end-of-period "hot-lining" existed at Leap, as account

managers stalled the completion of the removal process for terminated subscribers who had voluntarily or involuntarily been disconnected during the preceding reporting period in order "pad" their monthly subscriber figures. (¶ 11)

72.   In turn, the Management Defendants reported financial results and provided forecasts based solely on the Billing System's inflated metrics, which resulted from the failure of internal controls and Senior Management's desire to cut costs and boost the bottom line.   The Management Defendants did so despite their full knowledge, as set forth above, of the reporting lag, deferral of "hot-lining" subscribers at period-end and the related improper revenue recognition practices about which they were advised at regular mid-month and end of period meetings with Accounting Executives, directors, managers and senior staff.

## C.   Defendants' False and Misleading Statements During the Class Period

73.   Defendants artificially inflated the price of Leap's common stock by issuing materially false and misleading statements during the Class Period, including: press releases, Form 10-Q quarterly reports and Form 10-K annual reports filed with the SEC, statements of compliance with SOX filed with the SEC and conference calls with securities analysts as set forth below.

### 1.   Defendants' False and Misleading Statements Regarding Financial Results for the Quarter Ended June 30, 2006

#### a.   Leap's Second Quarter 2006 Earnings Press Release

74.   On August 3, 2006, Leap issued a press release entitled "Leap Reports Consolidated Results for Second Quarter 2006 ~ Strong Performance Led by Growth in Service Revenues and Operating Income." The Press Release highlighted dramatic growth in both operating income and net income as follows:

-- -- *Consolidated operating income of $16.5 million*, a 92% increase

from the consolidated operating income for the second quarter
of 2005

-- -- ***Consolidated net income of $7.5 million*** for the quarter, or
$0.12 per diluted share

*        *        *

Operating income for the second quarter was $16.5 million, nearly double the
operating income of $8.6 million for the second quarter of 2005. Net income for
the second quarter was $7.5 million, or $0.12 per diluted share. This compares to
net income of $1.1 million, or $0.2 per diluted share, for the second quarter of
2005.

Leap Wireless Earnings Press Release, August 3, 2006, p. 1. (Emphasis added).

75.      The statements in ¶ 74 were materially false and misleading, and made with

scienter because, in fact, outside consultants engaged by Leap, beginning in 2005 and throughout

the Class Period, made the Defendants aware of the material deficiencies and weaknesses in its

financial reporting functions and internal controls policies beginning in early 2006. (¶¶ 10-14,

45-49, 59-72).    These outside consultants, specifically CW#1, reported directly to Senior

Management, specifically Defendant Burton as well as the Accounting Executives, improper

revenue recognition practices which were engaged in at Leap and which resulted in material

inaccuracies in their financial reporting and failure to comply with SOX. (¶¶ 8-14, 45-49, 59-72).

This was made public when the Company disclosed on November 9, 2007 that it would be

forced to restate its financial results for this interim quarterly reporting period due to material

deficiencies in the Company's internal controls over the existence, completeness and accuracy of

revenues, cost of revenues and deferred revenues which resulted in material overstatement of

operating income and net income by ***40.11%*** and ***168.21%,*** respectively. (¶¶ 3, 151).

### b.   Leap Wireless Second Quarter 2006 Form 10-Q

76.   On August 8, 2006, Leap filed its Form 10-Q for the quarter ended June 30, 2006 with the SEC, signed by Defendant Hutcheson, which substantially incorporated the same materially false and misleading financial results, as set forth in ¶ 74, above.

77.   As alleged herein, the Company's overstatement of its financial results was the direct result of the Defendants' failure to properly recognize revenue in accordance with GAAP and indeed, in violation of the Company's stated revenue recognition policy.   Specifically, the June 30, 2006 Form 10-Q contained the following statement describing Leap's revenue recognition policy:

> *Revenues and Cost of Revenues*
> Cricket's business revenues principally arise from the sale of wireless services, handsets and accessories. Wireless services are generally provided on a month-to-month basis. *Amounts received in advance for wireless services from customers who pay in advance of their billing cycle are initially recorded as deferred revenues and are recognized as service revenues as services are rendered. Service revenues for customers who pay in arrears are recognized only after the service has been rendered and payment has been received.* This is because the Company does not require any of its customers to sign fixed-term service commitments or submit to a credit check, and therefore some of its customers may be more likely to terminate service for inability to pay than the customers of other wireless providers. …

Leap Wireless June 30, 2006 Form 10-Q, p. 4 (Emphasis added).

78.   As the Restatement ultimately acknowledged, the financial results reported in the Form 10-Q were materially false and misleading because Leap did not comply with the above-stated revenue recognition policy.   In particular, Leap's Billing System regularly recognized revenue before payment was received and/or continued to do so after the subscriber's wireless service had been terminated. (¶¶ 10-14, 45-49, 59-72, 160-170).   The Management Defendants falsely reported these figures with scienter, as they knew of or were deliberately reckless with respect to their falsity.   In fact, CW#1, CW#2 and CW#4 informed the Management Defendants

and Accounting Executives throughout the Class Period, specifically prior to and in preparation of the June 30, 2006 Form 10-Q, of material deficiencies and weaknesses in the Company's internal reporting and controls policies, including the deferral of hot-lining subscribers until after end-of-period financial results and subscriber figures had been finalized and reported. (¶¶ 11, 70-72). The Confidential Witnesses informed the Management Defendants that this lag in recording such terminations was resulting in improper recognition of service revenue for periods during which no service was activated. (¶¶ 46-47, 69-72). This was made public when the Company disclosed on November 9, 2007 that it would be forced to restate its financial results for this interim quarterly reporting period due to material deficiencies in the Company's internal controls over the existence, completeness and accuracy of revenues, cost of revenues and deferred revenues which resulted in material overstatement of operating income and net income for the quarter of *40.11%* and *168.21%,* respectively. (¶¶ 3, 151).

79.    In the Company's Form 10-Q for the period ended June 30, 2006, the Company reported two material weaknesses arising from certain internal controls deficiencies during the relevant reporting period. The Company stated that the material weaknesses arose from insufficient staffing in its accounting, financial reporting and tax functions and affected its ability to identify and address the applicability of certain GAAP principles in the Company's "complex and non-routine transactions." The Form 10-Q stated, in part:

> The material weaknesses and the steps the Company has taken to remediate the material weaknesses are described more fully as follows:
>
> *Insufficient Staffing in the Accounting, Financial Reporting and Tax Functions. The Company did not maintain a sufficient complement of personnel with the appropriate skills, training and Company-specific experience to identify and address the application of generally accepted accounting principles in complex or non-routine transactions.* The Company has also experienced staff turnover and an associated loss of Company-specific experience within its accounting, financial reporting and tax functions. This control

deficiency could result in a misstatement of accounts and disclosures that would result in a material misstatement to the Company's interim or annual consolidated financial statements that would not be prevented or detected. Accordingly, management has determined that this control deficiency constitutes a material weakness.

*       *       *

***This material weakness contributed to the following control deficiency, which is considered to be a material weakness.***

***Errors in the Accounting for Income Taxes. The Company did not maintain effective controls over its accounting for income taxes.*** Specifically, the Company did not have adequate controls designed and in place to ensure the completeness and accuracy of the deferred income tax provision and the related deferred tax assets and liabilities and the related goodwill in conformity with generally accepted accounting principles.

Leap Wireless June 30, 2006 Form 10-Q, p. 34. (Emphasis added).

80.    The statements in ¶ 79 were materially false and misleading, and made with scienter, because the Company, the Management Defendants, including Hutcheson, Burton and Khalifa, and the Audit Committee Defendants, were aware of material deficiencies and failures in Leap's internal controls and financial reporting relating to routine, every-day transactions beginning in 2005. (¶¶ 10-14, 45-49, 59-72). In fact, CW#1 directly informed the Accounting Executives and Defendant Burton of the deficiencies reflected in the Minutes Reports relating to recognition of service revenue and subscriber totals in 2005. (¶ 45). Furthermore, beginning in April 2006, CW#2 informed Senior Management and Accounting Executives of the continuing defects and weaknesses in internal controls over financial reporting which were evident upon performing the cash reconciliations of Leap's Billing System Minutes Reports. (¶ 46). Additionally, as set forth in ¶ 48, CW#4's group uploaded into Leap's Oracle Accounting database monthly assessments of the Company's internal controls and compliance to be disseminated and provided to Senior Management, including Hutcheson, Khalifa and Burton. These reports demonstrated that short-cuts in the porting process and a lack of connection

between the Billing System and the Provisioning System led to inconsistencies in financial reporting of everyday transactions.

### c. Second Quarter 2006 False Statements of SOX Compliance Filed By Defendant Hutcheson

81.     The Form 10-Q was signed by Defendant Hutcheson.  *See* June 30, 2006 10-Q at p. 53.  Further, pursuant to Section 302 of SOX, Defendant Hutcheson "certified" that the June 30, 2006 quarterly report on Form 10-Q did not contain "any untrue statement of material fact or omit to state a material fact" and that the Company had disclosed "all significant deficiencies and material weaknesses in the design or operating of internal control over financial reporting" as follows:

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF
2002**

I, S. Douglas Hutcheson, certify that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Leap Wireless International, Inc.;

2.     *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.     *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

\*          \*          \*

5.     The registrant's other certifying officer and *I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

*a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

*b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

/s/ S. DOUGLAS HUTCHESON
S. Douglas Hutcheson
*Chief Executive Officer and President*

Date: August 4, 2006

Leap Wireless June 30, 2006 Form 10-Q, Exhibit 31.1 (Emphasis added); *see also*, Exhibit 32 Hutcheson Certification pursuant to Section 906 of SOX ("the Report fairly presents, in all material respects, the financial condition and results of operations of the Company").

82. The statements in ¶ 81 were materially false and misleading, and made with scienter, because beginning in 2005, Defendants, including Hutcheson, knew of and/or were deliberately reckless as to material deficiencies and weaknesses in internal controls over financial reporting relating to the Company's revenue recognition practices and Billing System. (¶¶ 10-14, 45-49, 59-72). This became public knowledge on November 9, 2007 when Leap disclosed that it would be forced to restate its financial results for this interim quarterly reporting period due to previously undisclosed material deficiencies in the Company's internal controls over the existence, completeness and accuracy of revenues, cost of revenues and deferred revenues which resulting in an overstatement service revenue, operating income and net income by *40.11% and 168.21%,* respectively. (¶¶ 3, 151). The statements were made with scienter because CW#2, the head of the CCRT, reported findings of improper revenue recognition prior to cash receipt and deferred removal of terminated customers from the Billing System directly to Defendant Hutcheson, as set forth herein. (¶ 46).

**2.    Defendants' False and Misleading Statements
In Connection With Leap's Financial Results
For The Quarter Ended September 30, 2006**

**a.    Leap's Third Quarter 2006 Earnings Press Release**

83.    On November 7, 2006, as reported in a press release through Business Wire entitled "Leap Reports Consolidated Results for Third Quarter 2006," the Company announced its third quarter 2006 financial results as follows:

> -- *Consolidated operating income of $17.0 million*;
>
> -- *Consolidated net income of $10.0 million for the quarter,* or $0.16 per diluted share;
>
> SAN DIEGO--(BUSINESS WIRE)--Nov. 7, 2006--Leap Wireless International, Inc. (NASDAQ: LEAP), a leading provider of innovative and value-driven wireless communications services, today announced *financial and operational results for the third quarter ended September 30, 2006 that included strong year-over-year improvements in customer growth and consolidated service revenues.* ...
>
> \*        \*        \*
>
> *"The Company produced attractive operating results*, successfully launched a series of new markets, achieved outstanding results in Auction #66 and completed a series of capital market activities on favorable terms," *said Doug Hutcheson, chief executive officer and president of Leap.*

Leap Wireless November 7, 2006 Earnings Press Release, pp. 1-2. (Emphasis added).

84.    The statements in the preceding paragraph were materially false and misleading and made with scienter, because, in fact, Leap and the Management Defendants, including Hutcheson, Burton and Khalifa, knew of and/or were deliberately reckless as to, beginning in 2006, the material deficiencies and weaknesses in its financial reporting functions and internal controls policies by outside consultants engaged by Leap, beginning in 2005 and throughout 2006. (¶¶ 10-14, 45-49, 59-72). These outside consultants, specifically CW#1, reported directly to Senior Management, specifically Defendant Burton as well as the Accounting Executives,

improper revenue recognition practices which were engaged in at Leap and which resulted in material inaccuracies in their financial reporting and defects in SOX compliance. (¶ 45).    This was made public when the Company disclosed on November 9, 2007 that it would be forced to restate its financial results for this interim quarterly reporting period due to material deficiencies in the Company's internal controls over the existence, completeness and accuracy of revenues, cost of revenues and deferred revenues which resulted in material overstatement of operating income and net income for the quarter of *40.11%* and *168.21%*, respectively. (¶¶ 3, 151).

        **b.**    **Leap's Third Quarter 2006 Analyst Conference Call:**
                **Defendant Khalifa Falsely Assures Investors That**
                **Prior Period Material Weaknesses Are Remediated**

    85.    On November 7, 2006, Defendants Hutcheson and Khalifa participated in a conference call with securities analysts from, *inter alia*, Jefferies & Company ("Jefferies"), Bear Stearns ("Bear"), Credit Suisse Securities ("Credit Suisse"), Stanford Group ("Stanford"), Raymond James & Associates ("Raymond James"), Thomas Weisel Partners ("Thomas Weisel"), Soleil Securities Group ("Soleil"), Morgan Stanley ("Morgan"), Farallon Capital ("Farallon") and Banc of America Secutiries ("BAS").    On the conference call, Defendant Khalifa both indicated that the "material weaknesses" were limited in scope and were being addressed as follows:

> Reflecting on my first two months with Leap, they have been eventful and I am impressed with the energy and enthusiasm behind the Company's commitment to continue this growth. *My assessment of the accounting group is that they have made significant strides in addressing our material weaknesses,* to improve processes, in the hiring of key additional accounting and tax personnel.

Leap Wireless Third Quarter 2006 Earnings Conference Call, Final Transcript, November 7, 2006, p. 5 (Emphasis added).

86.    On November 8, 2008, the first full trading day after Leap announced its third quarter 2006 financial results, Leap's common stock price closed at $56.40 – up $0.74 from the previous day's close of $55.66 – with over 1.8 million shares traded.

87.    The statements in ¶ 85 were materially false and misleading, and made with scienter, because, Defendants, including Khalifa, knew of and/or were deliberately reckless as to the material weaknesses in Leap's internal controls and financial reporting in the Company's daily operations. (¶¶ 10-14, 45-49, 59-72). The statements in ¶ 85 discuss material weaknesses previously disclosed by Leap and only referred to Leap's internal controls relating to the application of GAAP in complex and non-routine transactions and the accounting for income taxes. Defendant Khalifa omitted to disclose that Leap, indeed, had material weaknesses in its "internal control over financial reporting related to the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenue and deferred revenues and ineffective testing of changes made to its revenue and billing systems in connection with the introduction or modification of service offerings." *See* 2007 Form 10-K at 25. (¶¶ 152-53). Khalifa's statements were made with deliberate recklessness as to their falsity in that: (i) CW#2's CRRT team found, and reported directly to Khalifa, systematic revenue recognition problems, arising from both discrepancies between recorded revenues and cash receipts and delayed hot-lining (¶¶ 11, 12, 46) and (ii) CW#4's group prepared monthly assessments of Leap's internal controls and compliance which were uploaded into the Oracle Accounting Database, to be provided to Senior Management, including Khalifa. (¶¶ 10-14, 46).

### c. **Leap's Third Quarter 2006 Form 10-Q**

88.     On or about November 9, 2006, Leap filed its Form 10-Q for the quarter ended September 30, 2006 with the SEC, which substantially incorporated the same materially false and misleading financial results, as set forth in ¶¶ 83-87, above.

89.     Leap's Form 10-Q for the quarter ended September 30, 2006, which was signed by Defendants Hutcheson and Khalifa, set forth the same revenue recognition policy (quoted above in ¶ 80) as contained in the Form 10-Q for the period ended June 30, 2006.  *See* Sept. 30, 2006 Form 10-Q at p.4-5.

90.     As set forth in ¶¶ 77-80, above, and as the Restatement ultimately acknowledged, the financial results reported in the Form 10-Q were materially false and misleading because Leap did not comply with its stated revenue recognition policy.  In particular, Leap's Billing System regularly recognized revenue before payment was received and/or continued to do so after the subscriber's wireless service had been terminated.  (¶¶ 10-14, 45-49, 59-72).  For the reasons set forth in ¶ 80, above, the Defendants falsely reported these figures with scienter, as they knew of or were deliberately reckless with respect to their falsity.

91.     The Form 10-Q was signed by Defendants Hutcheson and Khalifa.  *See* September 30, 2006 10-Q at p. 59.

92.     In the Company's Form 10-Q for the period ended June 30, 2006, the Company reported two material weaknesses arising from certain internal controls deficiencies during the relevant reporting period using the identical language as was used in Leap's quarterly filing with the SEC for the period ended June 30, 2006.  The Company stated that the material weaknesses arose from insufficient staffing in its accounting, financial reporting and tax functions and

affected its ability to identify and address the applicability of certain GAAP principles in the Company's "complex and non-routine transactions." (¶ 79).

93.    For the same reasons as set forth in ¶ 80, above. the statements referenced in the above paragraphs were materially false and misleading and made with scienter.  In addition, CW#5 had begun performing SOX testing for Leap, and uncovered that delayed removal of terminated customers from the Billing System until after the close of a quarter rendered the Company non-compliant with SOX rules and requirements relating to internal controls in public companies.  CW#5 reported these findings directly to Defendant Burton and Assistant Controller Lu on a weekly basis.  (¶ 49).

### d.    Third Quarter 2006 False Statements of SOX Compliance By Defendants Hutcheson and Khalifa

94.    Further, pursuant to Sections 302 and 906 of SOX, Defendants Hutcheson and Khalifa "certified" that the September 30, 2006 quarterly report on Form 10-Q did not contain "any untrue statement of material fact or omit to state a material fact" and that Hutcheson and Khalifa had disclosed "all significant deficiencies and material weaknesses in the design or operating of internal control over financial reporting."    *See* Sept. 30, 2006 Form 10-Q at Exhibits 31.1, 31.2 and 32.

95.    For the reasons as set forth in ¶ 82, above, Hutcheson's and Khalifa's SOX certifications were materially false and misleading and made with scienter.

3.   **Defendants' False And Misleading Statements In Connection With Its Financial Results For The Fiscal Year- And Quarter-Ended December 31, 2006**

    a.   **Leap's Fourth Quarter and Fiscal Year 2006 Earnings Press Release**

96.   On February 27, 2007, in a press release entitled "Leap Reports More than 260,000 Net Customer Additions in the Fourth Quarter and Completes Launch of Approximately 20 Million Covered POPS by Year End," the Company announced its fourth quarter 2006 and Fiscal Year Ended December 31, 2006 results as follows:

> Leap Wireless International, Inc. (NASDAQ: LEAP), a leading provider of innovative and value-driven wireless communications services, today announced financial and operational results for the fourth quarter and year ended December 31, 2006. ...
>
> ***"Our 2006 results reflect well-executed strategies for growth, anchored on the distinct value of our unlimited service propositions and the low-cost structure supporting these strategies," said Doug Hutcheson, Leap's chief executive officer and president...***
>
>            *        *        *
>
> **Key Reported Results**
> (Amounts in millions, except per share amounts)

| | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | Change | 2006 | 2005 | Change |
| | (Unaudited) | | | (Unaudited) | | |
| | | * | * | * | | |
| Operating income (loss) | $(9.5) | $10.8 | NM(a) | $43.8 | $69.8 | (37.2)% |
| Net income (loss) | $(39.4) | $5.0 | NM | $(4.1) | $30.0 | NM |

Leap Wireless February 27, 2007 Earnings Press Release, pp. 1-2. (Emphasis added).

97.    The statements in ¶ 96 above were materially false and misleading, and made with scienter because Defendants were aware of Leap's failure to address deficiencies and weaknesses in the Company's internal controls over financial reporting and subscriber records throughout the Class Period.   Specifically, Defendants were regularly informed of these deficiencies at mid-month and end of period meetings (attended by Senior Management, Accounting Executives, directors and managers) throughout late 2006 and early 2007 by confidential witnesses who worked in the Company's accounting departments during the Class Period. (¶¶ 10-15, 45-49, 59-72).  Moreover, Defendants knew and/or were deliberately reckless in their failure to address the deficiencies in Leap's internal controls over financial reporting and revenue recogntion which resulted in the Company's failure to comply with SOX requirements throughout 2006 and 2007. (¶¶ 48-49).   Ultimately, these failures by the Senior Management to address these issues throughout 2006 resulted in Leap's restatement of its fourth quarter 2006 financial results due to material overstatements of operating income and net income by 42% and 13.77%, respectively, as well as restatement of its fiscal year-ended December 31, 2006 to reconcile material overstatement of operating income and net income for the quarter of 84.7% and 83%, respectively. (¶¶ 3, 151).

**b.    Leap's Fourth Quarter 2007 Earnings Conference Call: Investors Falsely Assured that Material Accounting Weakness Had Been "Remediated"**

98.    On February 27, 2007, Defendants Hutcheson and Khalifa participated on a conference call with securities analysts, including representatives from, *inter alia,* JP Morgan Chase & Co. ("JPM"), Raymond James, Citigroup ("Citigroup"), Jefferies, Credit Suisse, BAS, Solo Securities ("Solo") and Cannon Capital ("Cannon") to discuss the Company's fourth quarter and fiscal year 2006 financial results.  On that conference call, Defendant Khalifa assured investors that the material accounting weakness has been resolved as follows:

Also, the Company previously identified material weaknesses in its internal controls related to staffing and the accounting and Tax functions and accounting for income taxes. We have worked hard to clear these issues, and *I am pleased to report that we have remediated these material weaknesses*.

Leap Wireless, Fourth Quarter and Fiscal Year 2006 Earnings Conference Call, Final Transcript, p. 5. (Emphasis added).

99.     Leap's common stock price was directly impacted by the Company's materially false and misleading statements regarding it results for the quarter and year ended December 31, 2006.  On February 28, 2007, Leap's common stock closed at $67.57 – up $5.59 from the previous days' close of $61.98 – with over 2.1 million shares traded.

100.    For the reasons set forth in ¶ 87, Defendant Khalifa's statement was materially false and misleading, and made with scienter, because while the Company may have remedied these specific material weaknesses, Leap and Defendant Khalifa failed to disclosed to investors that undisclosed material weaknesses in the Company's internal controls concerning everyday transactions existed throughout 2006 and 2007. (¶¶ 10-14, 45-49, 50-72).  These failures by the Senior Management to address these issues throughout the Class Period resulted in Leap's restatement of its fourth quarter 2006 financial results due to material overstatements of operating income and net income by 42% and 13.77%, respectively, as well as restatement of its fiscal year-ended December 31, 2006 to reconcile material overstatement of operating income and net income for the quarter of 84.7% and 83%, respectively. (¶¶ 3, 151).

c.      **Leap's Fiscal Year 2006 Form 10-K**

101.    On or about March 1, 2007, Leap filed its Form 10-K for the year ended December 31, 2007 with the SEC, which substantially incorporated the same materially false and misleading reported financial results, as set forth in ¶¶ 96, above.

102.    Just as in Leap's interim quarterly reports during 2006, Leap's Form 10-K filing

for fiscal year-ended December 31, 2006 represented that "[s]ervice revenues for customers who

pay in arrears are recognized *only after the service has been rendered and payment has been*

*received."* More specifically, Leap represented, with respect to its Cricket service plan that:

> **Revenues**
>
> ...  We do not require any of our customers to sign fixed-term service
> commitments or submit to a credit check, and therefore some of our customers
> may be more likely to terminate service for inability to pay than the customers of
> other wireless providers. *Amounts received in advance for wireless services from*
> *customers who pay in advance of their billing cycle are initially recorded as*
> *deferred revenues and are recognized as service revenues as services are*
> *rendered. Service revenues for customers who pay in arrears are recognized*
> *only after the service has been rendered and payment has been received.*
> Starting in May 2006, all new and reactivating customers are required to pay for
> their service in advance.

Leap Wireless December 31, 2006 Form 10-K, p. 47. (Emphasis added).

103.    Leap's statements ¶ 102 were materially false and misleading and made with

scienter since, as alleged herein, at ¶¶ 98-103, and as the Restatement ultimately acknowledged,

the financial results reported in the Form 10-Q were materially false and misleading because

Leap did not comply with the above-stated revenue recognition policy.   In particular, Leap's

Billing System regularly recognized revenue before payment was received and/or continued to

do so after the subscriber's wireless service had been terminated.  (¶¶ 10-14, 45-49, 59-72).  For

the reasons set forth in ¶81, above, the Management and Audit Committee Defendants falsely

reported these figures with scienter, as they knew of or were deliberately reckless with respect to

their falsity.

104.    In fact, the widespread failure in Leap's operation's segment to properly and

timely hot-line terminated subscribers during 2006 resulted in Leap improperly recognizing

service revenue for terminated subscribers such that the magnitude of its overstatement of

operating income and net income, as later admitted in the Restatement, was a whopping 84.7% and 83%, respectively. (¶¶ 3, 151). Senior Management was advised of these problems throughout the Class Period by outside consultants responsible for financial reporting and SOX compliance at regular meetings and in internal reports, i.e., SOX Testing Reports. (¶¶ 25, 36, 49).

        **d.    Leap's 2006 Annual Report to Shareholders Misrepresented Reported Revenues and Operating Income Performance**

    105.   On or about February 28, 2007, in connection with its Form 10-K filing with the SEC, Leap issued its Annual Report to Shareholders that substantially incorporated the same reported financial results, as set forth above. In addition, the Annual Report included numerous materially false and misleading statements touting the Company's progress and development during 2006. For example, right up front Leap represented:

> In 2006, we consistently delivered **improvements in margins**, subscriber growth and average revenue per user, while many of our new markets **reached OIBDA break-even levels faster than expected.** With our solid execution, **strong cashflow generation** and continued opportunities for expansion, we have Wall Street talking...and investing.

Leap Wireless 2006 Annual Report, inside cover. (Emphasis added).

    106.   Leap's statement in the preceding paragraph was materially false and misleading since, as alleged herein, and confirmed by Leap's 2007 Restatement, the "improvements in margin" were inaccurate since, *inter alia*, those calculations included revenue recognized from customers that had discontinued service and/or for service that was not provided thereby inflating operating margins. In fact, confidential witnesses informed Senior Management directly throughout the Class Period of the improper practice of deferring hot-lining and improper revenue recognition practices. (¶¶ 10-14, 45-49, 50-72). As such, Senior Management knew of and/or was deliberately reckless as to the fact that this improper practice of deferring

removal of subscribers from the Billing System resulted in the reporting of inflated service revenues and subscriber figures: (¶¶ 2, 46, 59-72, 106).

107.    The 2006 Annual Report included Defendant Hutcheson's "Letter from the CEO" to shareholders which contained materially false and misleading statements touting Leap's 2006 operations and financial results, including "increased operating margins" and "higher customer revenues," as follows:

Dear Fellow Stockholders,

*For Leap, 2006 was a year of solid execution and tremendous growth.* We added new markets, new products and new capabilities to enhance our "unlimited value" proposition. We put together the capital, the *technology*, the spectrum assets and the management team to expand our national presence in the years ahead. *Meanwhile, in the midst of all of this activity, we continued delivering attractive financial performance.*

\*        \*        \*

Throughout the year, we remained centered on our "unlimited" mantra. In 2006, we built on this theme, bundling more features and functionality into our product portfolio and adding value to our rate plans. Our cost-efficient operating structure allowed us to deliver these unlimited wireless services at prices among the lowest in the industry. *At the same time, our fundamental commitment to cost control fueled increased operating margins, allowing us to achieve higher customer revenues in our existing markets with limited additional costs, further validating our business model.*

\*        \*        \*

*2006: EXECUTE*
*From new products to new markets, disciplined execution was key to our financial and operational success in 2006.* Our unlimited Cricket offerings continued their evolution, *improving margins* while providing even more value to consumers. We started bundling services previously offered a la carte, adding greater value to our unlimited plans, still offered at affordable flat rates.

\*        \*        \*

We also enhanced performance in existing markets by finding new ways to improve returns. *We moved to pay-in-advance billing to simplify our customer experience* and completed the transition of long distance services to more cost-

effective Voice over Internet Protocol (VoIP) networks, making us one of the first to use a nearly all-VoIP transport network. ...

Leap Wireless 2006 Annual Report, pp. 2-4 (Emphasis added).

108.    The statements made by Defendant Hutcheson in the above ¶ 107 were materially false and misleading because Leap's operating margins were significantly overstated due to the improper recognition of revenue for terminated subscribers which had not yet been removed from the Billing System database. (¶¶ 59-72). Leap's improper revenue recognition practices with regards to their Cricket pay-in-arrears customer base was one of the main factors which gave rise to Leap's overstatement of service revenue throughout 2006 and the first two quarters of 2007. (¶¶ 50-56, 66-72).

109.    In addition, the 2006 Annual Report also included "A Letter from the CFO" signed by Defendant Khalifa that also falsely touted Leap's "strong financial results," "attractive operating margins" and increased OIBDA, as follows:

Dear Fellow Stockholders,

This year, Leap continued to grow in what was otherwise a maturing wireless sector. In the current environment, it is exciting to find a carrier that is delivering significant cash flow, even while executing on an expansion plan expected to nearly double the size of its business. *Our performance in 2006 and the activities undertaken in the capital markets created a solid financial structure to support this growth as well as the strategic expansion of our business in the years ahead.*

*In a year of substantial change and expansion activity, our disciplined approach resulted in total revenues of $1.1 billion in 2006, up 24 percent from the prior year...*

*With a business model designed to create the highest value at the lowest cost, we were able to realize attractive operating margins in our existing markets, even while expanding into new ones.* Although consolidated income from operations was down 37 percent for the year as a result of expansion costs, *we experienced substantial growth driven by the performance in our existing markets—those in operation at the end of 2005—as reflected in the 34% increase in adjusted*

*OIBDA, or Operating Income Before Depreciation and Amortization, for the full-year 2006.*

*At the same time our existing markets were producing improved margins*, we were investing in our network infrastructure and funding marketing activity to support new launches throughout the year. ...

\*        \*        \*

*During the year, we generated strong financial results while building a solid foundation for growth.*

Leap Wireless 2006 Annual Report, p. 6. (Emphasis added).

110.    The statements made by Defendant Khalifa in ¶ 109 were materially false and misleading, and made with scienter because Defendants knew of and/or were deliberately reckless as to the fact that due to Leap's improper revenue recognition practices and deficiencies in internal controls relating to its financial reporting and Billing System, Leap's operating margins were significantly overstated throughout the Class Period. (¶¶ 3, 59-72, 151). Senior Management was, in regular meetings, as set forth herein at ¶¶ 10-14, 45-49, 50-72, regularly apprised of the material defects in the Company's internal controls and the results such defects had on the accounting segment's preparation and cash reconciliation of the Company's financial results. (¶¶ 11, 13, 80, 87, 110, 141, 147, 149). Moreover, throughout 2006 and 2007, Senior Management reviewed monthly assessment reports and SOX Testing Reports prepared by outside consultants, which clearly set forth that material defects and failures in the Company's financial reporting and internal controls policies persisted in the Company's common and every-day transactions and operations (not just "complex non-routine transactions"). (¶¶ 14, 48-49, 80, 87).

**e. Fiscal Year 2006 Form 10-K: Leap Misrepresents
That The Company's Internal Controls Over Financial
Reporting Were Effective As Of December 31, 2006**

111.  In its Form 10-K for the fiscal year-ended December 31, 2006, signed by Defendants Hutcheson, Khalifa, Burton, Harkey, LaPenta and Targoff, Leap falsely represented to investors that the Company, specifically Defendants Hutcheson and Khalifa, evaluated the Company's disclosure controls and procedures and "concluded that [the Company's] disclosure controls and procedures were effective at the reasonable assurance level" and "that [the Company's] internal control over financial reporting was effective as of December 31, 2006":

**Item 9 A. *Controls and Procedures***

**(a) Evaluation of Disclosure Controls and Procedures**

*Disclosure Controls and Procedures*
.    We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified by the SEC and that such information is accumulated and communicated to management, including our chief executive officer, or CEO, and chief financial officer, or CFO, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Management, with participation by our CEO and CFO, has designed our disclosure controls and procedures to provide reasonable assurance of achieving desired objectives. As required by SEC Rule 13a-15(b), in connection with filing this Annual Report on Form 10-K, management conducted an evaluation, with the participation of our CEO and our CFO, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act, as of December 31, 2006, the end of the period covered by this report. Based upon that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective at the reasonable assurance level.

\*        \*        \*

**(b)    Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of our management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2006 based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the criteria established in *Internal Control — Integrated Framework*, our management concluded that our internal control over financial reporting was effective as of December 31, 2006.

Management's evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2006 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

Leap Wireless December 31, 2006 Form 10-K, pp. 100-01. (Emphasis added).

112.   In addition the statements made by Defendant Khalifa to analysts during the February 27, 2007 conference call, Leap, in the 2006 Form 10-K, falsely assured investors that previous material weakness – arising solely from a lack of sufficient personnel with the appropriate skills and experience to apply GAAP accounting to "complex or non-routine

transactions" and the Company's lack of effective controls over its accounting for income taxes – had been remediated:

### Remediation of Previous Material Weaknesses

From December 31, 2004 through September 30, 2006, we reported the following material weaknesses in our internal control over financial reporting:

• *We did not have sufficient personnel with the appropriate skills, training and Company-specific experience to identify and address the application of generally accepted accounting principles in complex or non-routine transactions.* We also experienced staff turnover and an associated loss of Company-specific experience within our accounting, financial reporting and tax functions.

• *We did not maintain effective controls over our accounting for income taxes.* Specifically, we did not have adequate controls designed and in place to ensure the completeness and accuracy of the deferred income tax provision and the related deferred tax assets and liabilities and the related goodwill in conformity with generally accepted accounting principles. This control deficiency resulted in the restatement of our consolidated financial statements for the five months ended December 31, 2004, the two months ended September 30, 2004 and the quarters ended March 31, 2005, June 30, 2005 and September 30, 2005.

We have taken the following actions to remediate these material weaknesses:
• We have filled existing vacancies and we have created and filled a number of new management positions within our accounting, financial reporting and tax functions with qualified and experienced individuals. These include the following positions:

• a new vice president, chief accounting officer hired in May 2005,
• a new director of tax to lead our tax function hired in June 2006,
• a new executive vice president, chief financial officer hired in August 2006,
• a new assistant controller hired in December 2006,
• a new director of financial reporting hired in December 2006, and
• a number of other new accounting management personnel hired since February 2005.

These individuals collectively possess a strong background in technical accounting and the application of generally accepted accounting principles in complex or non-routine transactions, as well as a strong background in interpreting and applying income tax accounting literature and preparing income tax provisions. Management believes that we had sufficient, full-time personnel with the necessary qualifications and experience to identify and resolve complex or non-routine

accounting matters, including income tax accounting, for a sufficient period of time as of December 31, 2006.

• We improved our internal controls over accounting for income taxes by establishing detailed procedures for the preparation and review of the income tax provision, including review and oversight by our director of tax and our chief accounting officer.

Based on the remediation actions described above, *management has concluded that these material weaknesses have been remediated as of December 31, 2006.*

Leap Wireless December 31, 2006 Form 10-K, pp. 100-01. (Emphasis added).

113.    The statements in the ¶¶ 111-12 were materially false and misleading and made with scienter, for the reasons alleged in ¶¶ 77-82, 89-95, 101-04, above, because Defendants knew and/or were deliberately reckless as to the fact that Leap's continued material weaknesses in its internal controls over financial reporting and improper revenue recognition practices. (¶¶ 10-14, 45-49, 50-72).  In particular, as later acknowledged by the Restatement, throughout the Class Period Leap had material weaknesses in its "internal control over financial reporting related to the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenue and deferred revenues and ineffective testing of changes made to its revenue and billing systems in connection with the introduction or modification of service offerings."  *See* Leap Wireless 2007 Form 10-K at p. 25.  (¶¶ 152-53).

**f.    The Individual Defendants Signed the 2006 Form 10-K And Defendants Hutcheson and Khalifa Certified Leap's Fiscal Year Ended December 31, 2006 Financial Statements**

114.    The Form 10-K was signed by Defendants Hutcheson, Khalifa, Burton, Harkey, LaPenta and Targoff.  *See* Leap Wireless December 31, 2006 10-K at p. 109.

115.    As set forth above at ¶ 80, pursuant to Sections 302 and 906 of SOX, Defendants Hutcheson and Khalifa "certified" that Leap's December 31, 2006 annual report on Form 10-K did not contain "any untrue statement of material fact or omit to state a material fact" and that

Hutcheson and Khalifa had disclosed "all significant deficiencies and material weaknesses in the design or operating of internal control over financial reporting." *See* 2006 Form 10-K at Exhibits 31.1, 31.2 and 32.

116.    The statements referenced in ¶ 115 were materially false and misleading and made with scienter, for the reasons alleged in ¶¶ 77-82, 89-95, 101-04, 111-14, above, because Defendants knew and/or were deliberately reckless as to the fact that Leap continued to experience material weaknesses in its internal controls. (¶¶ 10-14, 45-49, 50-72). In particular, as later acknowledged by the Restatement, throughout the Class Period Leap had material weaknesses in its "internal control over financial reporting related to the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenue and deferred revenues and ineffective testing of changes made to its revenue and billing systems in connection with the introduction or modification of service offerings." *See* Leap Wireless 2007 Form 10-K at p. 25. (¶¶152-53).

      **4.**      **Defendants' False and Misleading Statements In Connection With Its Financial Results For The Fiscal Quarter-Ended March 31, 2006**

      **a.**      **Leap's First Quarter 2007 Earnings Press Release**

117.    On May 8, 2007, as reported by the Company in a press release entitled "Leap Reports 318,000 Net Customer Additions in First Quarter 2007, Nearly Triple Net Additions in First Quarter 2006," the Company announced its first quarter 2007 financial results as follows:

**Leap Reports 318,000 Net Customer Additions in First Quarter 2007, Nearly Triple Net Additions in First Quarter 2006**

Company reports solid adjusted operating income before depreciation and amortization (OIBDA) of $81 million, up 38% compared to fourth quarter

\*     \*     \*

*The company reported service revenues of $326.8 million, a 51 percent increase*

*over the prior year quarter, driven by a 39 percent growth in weighted average customers and a nine percent rise in average revenue per user (ARPU).* For the first quarter, the company posted adjusted operating income before depreciation and amortization (OIBDA) of $81.0 million, up $22.1 million from the fourth quarter of 2006, and up $2.4 million from the comparable period of the prior year, even after the company absorbed expenses associated with the cost of acquiring a substantial number of new customers and the impact of new markets launched in 2006. *Operating income for the quarter was $4.4 million compared to $19.9 million for the first quarter of 2006, reflecting the impact of additional depreciation expense associated with new market expansion.*

*     *     *

*The company incurred a net loss of $8.1 million, compared to net income of $17.7 million for the corresponding quarter of the prior year, which reflects the impact of additional depreciation and interest expense associated with new market expansion and financing activities in 2006. Compared to the fourth quarter 2006 net loss of $39.4 million, the net loss improved by $31.3 million.*

Leap Wireless Earnings Press Release, May 8, 2007, p. 1. (Emphasis added).

118.   On May 9, 2007, Leap's common stock closed at $84.32 per share, up $4.86 from the previous day's close of $79.46 – with over 1.44 million shares traded.

119.   The statement in ¶ 117 were materially false and misleading and made with scienter, because, in fact, Defendants knew of and/or were deliberately reckless in failing to recognize that Leap's internal controls were so flawed so as to inaccurately record and report revenue, operating income and net income; Defendants were knew of and/or were deliberately reckless in failing to recognize that Leap was not compliant with its reporting obligations under the Sarbanes-Oxley Act of 2002 (¶¶ 10-14, 45-49, 50-72); and, because Leap was forced to restate its first quarter 2007 financials in order reconcile a material overstatement of operating income and net income by *383%* and *66.4%*, respectively. (¶¶ 3, 151).

### b.   Leap First Quarter 2007 Earnings Conference Call

120.   On May 8, 2007, Defendants Hutcheson and Khalifa participated on a conference call with securities analysts from, *inter alia*, JPM, Raymond James, Citigroup, Jefferies, Credit

Suisse, BAS, Soleil and Prudential Securities ("Prudential"). On that conference call, Defendant Hutcheson stated to investors that over 17% of the Company's 3.4% churn rate for the quarter was directly the result of customers who open new accounts and upgrade to newer handsets, and that analysts should expect the churn rate to increase by 0.5% in the second quarter as compared to the second quarter 2006 for the same reasons:

> The effect of customer tenure and handset upgrades deserves additional discussion. Regarding our customer tenure, the longer customers have been with us, the less likely they are to churn. As a result of our recently -- recent accelerating customer growth, we estimate that our average customer tenure has decreased by three months, a reduction of close to 25%. This growing number of new customers creates upward pressure on churn which we expect will continue for the next several quarters. In addition as we introduce new handset models more customers replace their existing handset many seek handset upgrades. Some upgrade their handsets by simply purchasing a new handset and continuing their existing account. Other customers purchase a new handset, start a new account, and then allow their old account to lapse. These customers received the first month of new service for free, but experienced the inconvenience of getting a new phone number and are included in our churn calculations. In either case, these customers who choose to remain with us when they upgrade, their handsets represent a positive net value for our business.
>
> With that background, the first quarter results and the second quarter forecast become easier to understand and reflect the progress we're making on churn in total. In the first quarter customers who upgraded their phones by terminating their existing service and starting a new line accounted for 0.6% of our 3.4% churn for the quarter. If we adjust for the relative increase in customers who are upgrading handsets by this method, churn for the first quarter of 2007 would have been down, approximately, 0.3% from churn in the first quarter of 2006. Our churn performance, when taken in context underscores the progress we have made and the success our churn rate reduction efforts are achieving. We expect churn for the second quarter of 2007, to be between 4.1% and 4.4%. An increase of, roughly, 0.5% over last year's second quarter results. We believe that the bulk, if not all of this projected increase, will reflect year-over-year changes in customer handset upgrade activity.

Leap Wireless, May 8, 2007 Earnings Conference Call, Final Transcript, pp. 5-6.

121.    The statements in the above paragraph were false and materially misleading, and made with scienter, because Leap and the Individual Defendants, specifically Hutcheson, knew of and/or were deliberately reckless as to, as early as May 2007, material information in their

possession specifying the Company's improper revenue recognition and subscriber calculations resulting from the problems relating to the lack of integration between the Provisioning and Billing Systems, resulting in deferral of the removal of terminated subscribers in the Billing System, as well as the practice of delaying the hot-lining of subscribers at year-end to "pad" the yearly figures. (¶¶ 10-14, 45-49, 57-72). In fact, confidential witnesses, including CW#2 and CW#3 informed Hutcheson and the other Management Defendants, as early as 2006 these improper practices resulted in the counting of a subscriber as a "current subscriber" as well as a "new addition" for the same period, and recognizing twice as much service revenue in the process. (¶ 46). While the "double-counting" of the subscriber was remedied in subsequent periods and considered to be part of the churn calculation, the corresponding "double-counting" of revenue was the basis for the eventual November 9, 2007 restatement. (¶¶ 45-49, 59-72).

> **c.    First Quarter 2007 Form 10-Q: Leap Reiterates Its Revenue Recognition Policy And Assures Investors That There Were No Changes In Internal Controls That Would Materially Affect Internal Control Over Financial Reporting**

122.    On or about May 10, 2007, Leap filed its Form 10-Q for the quarter ended March 31, 2002 with the SEC, which substantially, incorporated the same materially false and misleading reported financial results, as set forth in ¶ 80, above.

123.    Leap's Form 10-Q for the quarter ended March 31, 2007 repeated Leap's revenue recognition policy, as set forth above in ¶ 77, above. [2Q'06, 3Q'06, FY 2006]. *See* Leap Wireless March 31, 2007 Form 10-Q at p. 5. As alleged herein, and as the Restatement ultimately acknowledged, the financial results reported in the Form 10-Q were materially false and misleading because Leap did not comply with its stated revenue recognition policy. In particular, Leap's Billing System regularly recognized revenue before payment was received and/or continued to do so after the subscriber's wireless service had been terminated. (¶¶ 10-14,

44-49, 59-72). For the reasons set forth in ¶ 80, above, the Management and Audit Committee Defendants falsely reported these figures with scienter, as they knew of or were deliberately reckless with respect to their falsity.

124.    Leap also represented in its March 31, 2007 Form 10-Q's Notes to the Financial Statements "Item 4. Control and Procedures" that the Company maintains "effective" disclosure controls and procedures to ensure the accuracy of its financial reporting, as follows:

> *We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported* within the time periods specified by the SEC and that such information is accumulated and communicated to management, including our chief executive officer, or CEO, and chief financial officer, or CFO, as appropriate, to allow for timely decisions regarding required disclosure.

*     *     *

> *Management, with participation by our CEO and CFO, has designed our disclosure controls and procedures to provide reasonable assurance of achieving desired objectives.* As required by SEC Rule 13a-15(b), in connection with filing this Quarterly Report on Form 10-Q, management conducted an evaluation, with the participation of our CEO and our CFO, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act. *Based upon that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of March 31, 2007.*

*     *     *

> *There were no changes in our internal control over financial reporting during the fiscal quarter ended March 31, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*

Leap Wireless, March 31, 2007 Form 10-Q, p. 30. (Emphasis added).

125.    The statements set forth and referred to in ¶¶ 123-24 were materially false and misleading and made with scienter, because Defendants, specifically Hutcheson, Khalifa and

Burton, knew of and/or were deliberately reckless as to existing material weaknesses and deficiencies in the Company's internal controls over financial reporting relating to its Billing System and lack of internal controls procedures, as later admitted in the Company's Restatement. *See* Leap Wireless December 31, 2007 Form 10-K, p. 25. (¶¶ 152-53). These statements were made by Defendants with knowledge of and/or with deliberate recklessness as to their falsity. As explained above, CW#2 and CW#3 regularly informed Senior Management throughout the Class Period, including the First Quarter 2007 that the Company's internal controls deficiencies and improper revenue recognition practices were resulting in material inaccuracies in the Company's reported financial results. (¶¶ 10-14, 45-47, 59-72). Moreover, CW#4 and CW#5 regularly recorded in monthly assessments and periodic SOX Testing Reports, respectively, the Company's deficiencies in its internal financial reporting procedures and SOX compliance. These reports were contemporaneously provided to Senior Management and to PwC in connection with the audit of Leap's 2006 financial results. (¶¶ 48-49).

### d.    First Quarter 2007 Form 10-Q False Statements of SOX Compliance Signed By Defendants Hutcheson and Khalifa

126.    Leap's March 31, 2007 quarterly report on Form 10-Q was signed by Defendants Hutcheson and Khalifa. *See* March 31, 2007 Form 10-Q at p. 50.

127.    Further, pursuant to Sections 302 and 906 of SOX, Defendants Hutcheson and Khalifa "certified" that the March 31, 2007 quarterly report on Form 10-Q did not contain "any untrue statement of material fact or omit to state a material fact" and that Hutcheson and Khalifa had disclosed "all significant deficiencies and material weaknesses in the design or operating of internal control over financial reporting." *See* March 31, 2007 Form 10-Q at Exhibits 31.1, 31.2 and 32.

128.    The statements referred to in ¶ 127 were materially false and misleading and made with scienter because Defendants knew of and/or were deliberately reckless as to the existing material weaknesses and deficiencies in the Company's internal controls over financial reporting relating to its Billing System and lack of internal controls procedures, as later admitted in the Company's Restatement.  *See* Leap Wireless December 31, 2007 Form 10-K, p. 25.  (¶¶ 10-14, 45-49, 59-72, 152-53).  These statements were made with knowledge of with deliberate recklessness as to their falsity.  As explained above, CW#2 and CW#3 regularly informed Senior Management throughout the Class Period, including the First Quarter 2007 that the Company's internal controls deficiencies and improper revenue recognition practices were resulting in material inaccuracies in the Company's reported financial results.  (¶¶ 10-14, 45-47, 59-72).  Moreover, CW#4 and CW#5 regularly recorded in monthly assessments and periodic SOX Testing Reports, respectively, the Company's deficiencies in its internal financial reporting procedures and SOX compliance.  (¶¶ 48-49).  These reports were contemporaneously provided to Senior Management and to PwC in connection with the audit of Leap's 2006 financial results.  (¶¶ 25, 31, 36, 48-49).

**5.    Defendants' False and Misleading Statements In Connection With Its Financial Results For The Fiscal Quarter-Ended June 30, 2007**

**a.    Leap Second Quarter 2007 Earnings Press Release**

129.    On August 7, 2007, in a press release entitled "Leap Reports Second Quarter 2007 Adjusted OIBDA of $115 Million, Up 48% Compared to Prior Year Quarter, New Markets in Aggregate Begin Contributing Positively to Adjusted OIBDA," the Company announced its second quarter 2007 financial results as follows:

**Leap Reports Second Quarter 2007 Adjusted OIBDA of $115 Million, Up 48% Compared to Prior Year Quarter, New Markets in Aggregate Begin**

**Contributing Positively to Adjusted OIBDA**

Company Reports 127,000 Net Customer Additions, More Than Double Net Additions from Second Quarter 2006

SAN DIEGO--(BUSINESS WIRE)--Aug. 7, 2007--Leap Wireless International, Inc. (NASDAQ:LEAP), a leading provider of innovative and value-driven wireless communications services, today announced financial and operational results for the second quarter 2007. *The company reported service revenues of $350.2 million, a 52 percent increase over the prior-year quarter . . . Operating income for the quarter was $36.9 million compared to $16.5 million for the second quarter of 2006.*

Leap Wireless, Second Quarter Earnings Press Release, August 7, 2007, p. 1. (Emphasis added).

130.   The statements in ¶ 129 were materially false and misleading and made with scienter because Defendants knew of and/or were deliberately reckless as to the existing material weaknesses and deficiencies in the Company's internal controls over financial reporting relating to its Billing System and lack of internal controls procedures, as later admitted in the Company's Restatement. *See* Leap Wireless December 31, 2007 Form 10-K, p. 25. (¶¶ 10-14, 45-49, 59-72, 152-153).   These statements were made with knowledge of with deliberate recklessness as to their falsity.   As explained above, CW#2 and CW#3 regularly informed Senior Management throughout the Class Period, including the First Quarter 2007 that the Company's financial reporting deficiencies, specifically improper revenue recognition practices, were resulting in material inaccuracies in the Company's reported financial results.   (¶¶ 10-14, 45-47, 59-72). Moreover, CW#4 and CW#5 regularly recorded in monthly assessments and SOX Testing Reports, respectively, the Company's deficiencies in its internal financial reporting procedures and periodic SOX compliance throughout 2006 and into 2007.   (¶¶ 48-49).   These reports were contemporaneously provided to Senior Management and to PwC in connection with the audit of Leap's 2006 financial results.   (¶¶ 25, 36, 48-49).   These conditions at the Company throughout 2006 and 2007 resulted in Leap's restating second quarter 2007 financial results to reconcile an

approximate *1% overstatement of revenue and a 20% overstatement in operating income.* (¶¶ 138-141).

**b.   Second Quarter 2007 Form 10-Q: Leap Reiterates Its Revenue Recognition Policy And Assures Investors That There Were No Changes In Internal Controls That Would <u>Materially Affect Internal Control Over Financial Reporting</u>**

131.   On or about August 9, 2007, Leap filed its Form 10-Q for the quarter ended June 30, 2007 with the SEC, which substantially incorporated the same materially false and misleading reported financial results, as set forth above. *See* Leap Wireless June 30, 2007 Form 10-Q, p. 37-38.

132.   Leap also represented in its June 30, 2007 Form 10-Q's Notes to the Financial Statements "Item 4.   Control and Procedures" that the Company maintains "effective" disclosure controls and procedures to ensure the accuracy of its financial reporting, as follows:

> *We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported* within the time periods specified by the SEC and that such information is accumulated and communicated to management, including our chief executive officer, or CEO, and chief financial officer, or CFO, as appropriate, to allow for timely decisions regarding required disclosure.

*   *   *

> *Management, with participation by our CEO and CFO, has designed our disclosure controls and procedures to provide reasonable assurance of achieving desired objectives.* As required by SEC Rule 13a-15(b), in connection with filing this Quarterly Report on Form 10-Q, management conducted an evaluation, with the participation of our CEO and our CFO, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) promulgated under the Exchange Act. *Based upon that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of June 30, 2007.*

*   *   *

*There were no changes in our internal control over financial reporting during the fiscal quarter ended June 30, 2007 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*

Leap Wireless, June 30, 2007 Form 10-Q, pp. 37-38. (Emphasis added).

133.  The statements in ¶ 132 were materially false and misleading because of existing material weaknesses and deficiencies in the Company's internal controls over financial reporting relating to its Billing System and lack of internal controls procedures, as later admitted in the Company's Restatement.  *See* Leap Wireless December 31, 2007 Form 10-K, p. 25.  (¶¶ 10-14, 45-49, 50-72, 152-53).  These statements were made by Defendants with knowledge of and/or deliberate recklessness as to their falsity.  As explained above, CW#2 and CW#3 regularly informed Senior Management throughout the Class Period, including the Second Quarter 2007 that the Company's internal controls deficiencies and improper revenue recognition practices were resulting in material inaccuracies in the Company's reported financial results.  (¶¶ 10-14, 45-47, 59-72).  Moreover, CW#4 and CW#5 regularly recorded in monthly assessments and periodic SOX Testing Reports, respectively, the Company's deficiencies in its internal financial reporting procedures and SOX compliance.  These reports were contemporaneously provided to Senior Management and to Defendant PwC in connection with the 2006 audit.  (¶¶ 48-49, 36).

c.     **Leap's Partial Disclosure of Expected Increase In Customer Disconnects Omitted Truth Regarding Leap's Failure To Purge Its Billing System of <u>Subscribers It Had Already Terminated Service For</u>**

134.  In its August 7, 2008 press release, Leap provided "guidance" to analysts and the market indicated "weaker than expected" subscriber metrics – namely, that Leap "expected" customer churn to be greater in upcoming quarters.

**Third Quarter and Fiscal Year 2007 Business Outlook**

\* \* \*

"Due to high net customer additions we realized in the third quarter of 2006 as a result of new market launches, *we expect third quarter 2007 net additions to be lower than the prior year quarter. As a result of the recent addition of less-tenured customers in our newly-launched markets, we expect to continue to see additional near-term pressure on churn, and our experience in our more established markets indicates that churn rates should improve as the newly-launched markets mature.* We expect adjusted OIBDA in the third quarter to be approximately double the prior year quarter, before the effects of our major new initiatives."

\* \* \*

**The Company's outlook for third quarter 2007**
• Net customer additions are expected to be between 40,000 and 120,000.
• *Customer churn is expected to be in the range of 4.9 percent to 5.4 percent, reflecting typical seasonal rhythms and the effects of a greater number of less-tenured customers and customer handset upgrades.*
• Adjusted OIBDA is expected to be between $110 million and $120 million, which does not include approximately $10 to $15 million of negative adjusted OIBDA we expect to incur to support our major new initiatives.

Leap Wireless, Second Quarter Earnings Press Release, August 7, 2007, pp. 4-5. (Emphasis added).

135.    As alleged herein, Leap's statements in the preceding paragraph were materially false and misleading and, in fact, omitted material facts necessary to make the above statements not misleading.    Specifically, Defendants were aware of materially deficiencies in Leap's business operations, including the fact that the cellular service operating system was not directly integrated with the Billing System resulting in an understatement of customers who had already terminated services with Leap.  This understatement, once accurately accounted for, results in a material increase in customer churn – however, Defendants failed to disclose these facts as a contributing factor to the expected increase in customer churn in upcoming quarters.   Knowing full-well that the persistent lack of internal controls over, *inter alia*, Leap's financial reporting systems would trigger a restatement, Defendants sought to "soften the blow" by falsely and

misleadingly disclosing to the market that it anticipated an increase in customer churn based solely on other factors.

136.    On August 7, 2008, following the release of Leap's 2Q'07 financial results and weaker than expected guidance for the third quarter, Credit Suisse issued an analyst report entitled "2Q07 Results Inline But Guidance Light."   Most troubling was Leap's expected ability to add to its subscriber base in the face of increased customer churn:

**2Q07 Results In-line But Guidance Light**

Leap reported its 2Q07 results August 7, 2007 after the market close.   Despite mildly light net customer additions during the quarter, 2Q financial results were generally in line with estimates; however, guidance for the third quarter was weaker than expected.

- Subscriber metrics were in line with guidance, but a little weaker than we expected. ...

\*       \*       \*

***Leap's 3Q guidance is somewhat disappointing***. The EBITDA guidance of $110-120M implies a midpoint that is flat with 2Q results. However, this guidance excludes an expected $10-15M in additional costs related to new initiatives (coverage expansion, Auction 66 development and new high speed data products). These additional costs will dilute earnings in 2H07 and it is not clear when they will result in a positive return down the line (the coverage expansion should have a quick quantifiable return, but the high speed data initiative is much less certain, particularly given Leap's existing distribution). ***Leap is also expecting higher churn in the third quarter. There is some concern that this could be a subprime issue, although management flatly denied this notion on the conference and pointed out that there was flat churn in the core markets***. Instead, management feels that this is a new market issue, and the churn rate is rising as the "younger" customer base becomes a larger percentage of the total base.

Credit Suisse, Equity Research Analyst Report, August 7, 2007, pp. 1-3. (Emphasis added).

137.    Following the Leap's announcement of "expected" higher customer churn and the aforementioned analyst reports, on August 8, 2007, Leap's common stock closed at $60.00 – dropping precipitously from its previous day's close of $80.36 – with approximately 12.2 million shares traded representing a market capitalization loss of approximately $248 million.

6.    **The Truth Begins To Emerge – The Restatement**

a.    **Leap's November 9, 2007 Press Release Announces Restatement**

138.    On November 9, 2007, to the shock of the investment community, Leap announced that it would restate its financial results going back to fiscal year 2004, specifically its reported revenue figures, in a Company press release entitled "Leap Announces Restatement of Prior Period Results, ~ *Company Also Releases Preliminary Financial Results for the Third Quarter and Business Outlook for Fourth Quarter of 2007 ~.*"

139.    The November 9, 2007 press release stated, in pertinent part, as follows:

**Leap Announces Restatement of Prior Period Results**
*~ Company Also Releases Preliminary Financial Results for the Third Quarter and Business Outlook for Fourth Quarter of 2007 ~*

SAN DIEGO — November 9, 2007 — *Leap Wireless International, Inc. [NASDAQ: LEAP] today announced that it will restate its financial statements for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007 to correct for errors in previously reported service revenues, equipment revenues, and operating expenses.* Over these periods, *the restatements are expected to result in a net cumulative reduction of approximately $20 million in service revenues and approximately $20 million in operating income.* The estimated effect of these errors on the Company's prior period results for service revenues and operating income is set forth below. Changes in net income (loss) will be determined following the Company's completion of its tax expense calculations for these periods. *As a result of the pending restatements, the Company's previously issued financial statements for periods from fiscal year 2004 through the second quarter of 2007 should not be relied upon.* In reaching this conclusion, the Company's management and Audit Committee have discussed the matters described in this press release with the Company's independent registered public accounting firm.

*The restatements are the result of an internal review of the Company's service revenue activity and forecasting process that was initiated by management in September 2007* and are not attributable to any misconduct by Company employees. The expected adjustments to historical financial results do not change unrestricted cash, cash equivalents and short term investments as of June 30, 2007. In addition, they do not materially change the overall trend in service revenues, nor do they materially change overall trends in ARPU, CPGA, CCU or capital expenditures. Finally, the expected adjustments do not impact previously reported results for net customer additions or churn.

*Description of Accounting Errors*
*The most significant adjustment relates to the Company's prior accounting for a group of customers who voluntarily disconnected service. These customers comprised a small percentage of the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers. This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.*

Leap Wireless, November 9, 2007 Earnings Press Release, pp. 1-2. (Emphasis added).

140.    As a result of Leap's shocking November 9, 2007, announcement, the Company's common stock closed at $36.72 per share, declining 37% from the previous trading day's close of $58.10, on very heavy trading volume of 11,377,500 shares, over six times the prior trading days' volume, representing a loss in market capitalization of over $240 million.

141.    Also on November 13, 2007, Leap released a Form 8-K, substantially corroborating the information regarding its need to restate the Company's financial results going back to 2004.    The November 13, 2007 Form 8-K stated, in pertinent part, as follows:

On November 8, 2007, the Audit Committee of the Company's Board of Directors concluded that the Company's consolidated financial statements for the following periods (and for the applicable interim periods) should be restated and should no longer be relied upon: (i) the seven months ended July 31, 2004 (the period prior to the Company's emergence from Chapter 11 bankruptcy); (ii) the five months ended December 31, 2004 (the period after the Company's emergence); (iii) the fiscal year ended December 31, 2005; (iv) the fiscal year ended December 31, 2006; (v) the fiscal quarter ended March 31, 2007; and (vi) the fiscal quarter ended June 30, 2007.

The restatements are the result of an internal review of the Company's service revenue activity and forecasting process that was initiated by management in September 2007 and are not attributable to any misconduct by Company employees. The restatements correct errors in previously reported service revenues, equipment revenues, and operating expenses. *The most significant adjustment relates to the Company's prior accounting for a group of customers*

*who voluntarily disconnected service. These customers comprised a small percentage of the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers.* This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.

In connection with management's review, errors were also identified relating to the classification of certain components of equipment revenues and cost of equipment. Prior to June 2007, approximately $120 million of revenue from the sale of equipment was offset against related cost of equipment and reported on a net basis. The reclassification of these revenues and costs on a gross basis will not impact operating income.

\*        \*        \*

Although the Company's management is still evaluating the implications of the restatements described above on its internal control over financial reporting, when the Company files its Quarterly Report on Form 10-Q for the quarter ended September 30, 2007 and amends certain of its previously filed periodic reports to effect the restatements, *management expects the Company to report the existence of one or more material weaknesses in the Company's internal control over financial reporting relating to the restatements.* The Company's management and the Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K with the Company's independent registered public accounting firm.

Leap Wireless, November 13, 2007 Form 8-K, pp. 1-2. (Emphasis added).

142.    On November 13, 2007, Leap filed its Form NT 10-Q for the quarter ended September 30, 2007 with the SEC, notifying investors that due to the pending restating of its financial statements going back to fiscal year 2004, the Company would be delayed in filing its quarterly results on SEC Form 10-Q for the third quarter 2007.

143.    On November 13, 2007, Leap's common stock closed at $34.19 per share.

144. Analysts immediately reacted with concern to the Restatement and the greater than anticipated slowing of Leap's growth. Jeffries & Company analysts released its report soon after the announcement on November 9, 2006, stating:

> …The restatement is attributable to deferred revenue that was recorded for certain subscribers that had already disconnected.

> \* 〕 \* \*

> • **Raises Concerns Regarding Internal Controls.** …the fundamental concern relates to the effectiveness of the internal controls. *LEAP generates deferred revenue when it issues a subscriber a bill under a pay in advance (PIA) model. As such, the deferred revenue would be earned by LEAP only after the month of service has been completed. The fact that a subscriber disconnected and that the deferred revenue was not reversed (i.e. written off) indicates that there is a disconnect between the two systems. We believe investors will be concerned about the internal controls.*

Jefferies & Co., Research Analyst Report, November 9, 2007, p. 1. (Emphasis added).

145. Moreover, Credit Suisse, on November 12, 2007 commented as follows:

> **Accounting Issues**
> The bigger issue for many investors is likely to be the accounting restatement. There are no changes to cash balances. As indicated, the accounting issues relate to how some customer revenues were recognized after customers had terminated service, in the Company's pay in advance billing method. The net change is approximately 2% in the first half of 2007… The shift from bill in advance to arrears, has had a positive effect on the overall business, as customers are more likely to return to Leap service after a disconnection, because a previous month's service is no longer 'due.'

> \* \* \*

> **So Now What**
> *We think it could take several quarters for investors to fully put the issue of the accounting restatement behind them.*

> \* \* \*

Credit Suisse, Equity Research Analyst Report, November 12, 2007, pp. 2-3. (Emphasis added).

146.     Another analyst, Stanford Group Company issued a report on November 9, 2007 reiterating its hold rating on Leap, but noting that "the Restatements" may trigger a default under its senior secured credit agreement.

       **b.**    **December 2007 Conference Call: Defendant Hutcheson's**
                **Misleading Statements Regarding the Restatement Issues**

147.     On December 13, 2007, Defendant Hutcheson falsely represented to analysts that the Company's lack of internal controls in connection with revenue forecasting and accounting were only "revealed" after initiating a review of these areas in mid-September 2006:

> Over the past several quarters the Company has strengthened substantially its accounting organization. In mid-September we initiated a review of our service revenue forecasting and subsequently accounting processes to look at where we were at and the steps we needed to take to continue to improve. *The review revealed deficiencies in some of our account reconciliation, our reports, some analysis and testing of some of the changes to our revenue and billing system. We uncovered errors in accounting related to the timing of the recognition of some of our service revenues, the recognition of some components of our service revenues, classification of service equipment revenues and some operating expenses as well as some other nonmaterial items and some income tax adjustments.* The errors were neither intentional nor the result of employee misconduct, and the Company worked closely together with the audit committee and our independent auditors to correct errors.

**7.**    **Leap Files Its Fiscal Year 2006 Form 10K-A, March**
       **31, 2007 Form 10Q-A and June 30, 2007 Form 10Q-A**
       **With The SEC Restating Its Financial Results**

148.     On December 26, 2007, Leap filed an Amended Form 10-K/A with the SEC restating its financial results for the 2006 fiscal year, and explaining that the previously filed Form 10-K for the period reflected errors relating to accounting and timing for certain revenues:

> *These previously issued audited consolidated financial statements and unaudited condensed consolidated financial statements of the Company have been restated to correct errors relating to (i) the timing of recognition of certain service revenues prior to or subsequent to the period in which they were earned, (ii) the recognition of service revenues for certain customers that voluntarily disconnected service and (iii) the classification of certain components of service revenues, equipment revenues and operating expenses.*

Leap Wireless, December 31, 2006 Form 10-K/A, Explanatory Note. (Emphasis added).

149.    Furthermore, the Form 10-K/A for fiscal 2006, the Company cited material weaknesses and deficiencies in internal controls at the Company relating to the "existence, completeness and accuracy of revenues," stating:

> In connection with management's assessment of internal control over financial reporting, management identified the following material weakness as of December 31, 2006:
>
> *There were deficiencies in our internal controls over the existence, completeness and accuracy of revenues, cost of revenues and deferred revenues. Specifically, the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenues and deferred revenues did not detect the errors in revenues, cost of revenues and deferred revenues. A contributing factor was the ineffective operation of our user acceptance testing (i.e., ineffective testing) of changes made to our revenue and billing systems in connection with the introduction or modification of service offerings.* This material weakness resulted in the accounting errors which have caused us to restate our consolidated financial statements as of and for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 and for the period from January 1, 2004 to July 31, 2004, and our condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007. In addition, this material weakness could result in a misstatement of revenues, cost of revenues and deferred revenues that would result in a material misstatement to the Company's interim or annual consolidated financial statements that would not be prevented or detected on a timely basis.

Leap Wireless, December 31, 2006 Form 10-K/A, p. 111. (Emphasis added).

150.    Leap's Form 10-Q/As filed on December 26, 2007 for the fiscal quarters ended March 31, 2007 and June 30, 2007 contained the same language as set forth in the paragraph above. *See* March 31, 2007 Form 10-Q/A, p. 41; June 30, 2007 Form 10-Q/A, p. 51.

151.    In sum, the effect of the Restatement on Operating Income and Net Income on a yearly and quarterly basis for 2006 and on a quarterly basis for the first two quarters of fiscal 2007 is as follows:

| | | 2Q 2007 | 1Q 2007 | FY 2006 | 4Q 2006 | 3Q 2006 | 2Q 2006 |
|---|---|---|---|---|---|---|---|
| **Operating Income:** | Reported | $36,888 | $4,372 | $43,824 | ($9,508) | $17,002 | $16,452 |
| | Restated | $30,704 | ($1,543) | $23,725 | ($16,502) | $7,050 | $11,742 |
| | Difference | $(6,184) | $(5,915) | $(20,099) | $(6,994) | $(9,952) | $(4,710) |
| | % Overstated | 20.14% | 383.34% | 84.72% | 42.38% | 141.16% | 40.11% |
| **Net Income:** | Reported | $3,247 | ($8,123) | ($4,139) | ($39,352) | $9,979 | $7,510 |
| | Restated | $9,638 | ($24,224) | ($24,357) | ($45,637) | ($801) | $2,800 |
| | Difference | $6,391 | $(16,101) | $(20,218) | $(6,285) | $(10,780) | $($4,710) |
| | % Overstated | -86.31% | 66.47% | 83.01% | 13.77% | 1345.82% | 168.21% |

### 8.    February 2008: Leap Identifies Previously Undisclosed Material Weaknesses In The Company's Internal Controls

152.    On February 28, 2008, Lead filed its Form 10-K for the fiscal year-ended December 31, 2007, in which the Company disclosed that the "disclosure control and procedures were not effective at the reasonable assurance level" and that "material weaknesses" have been identified in our internal control over financial reporting, as follows:

> Section 404 of the Sarbanes-Oxley Act of 2002 requires companies to conduct a comprehensive evaluation of their internal control over financial reporting. To comply with this statute, we are required to document and test our internal control over financial reporting; our management is required to assess and issue a report concerning our internal control over financial reporting; and our independent registered public accounting firm is required to report on the effectiveness of our internal control over financial reporting.
>
> As described in "Part II — Item 9A. Controls and Procedures" of this report, our CEO and CFO concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2007. Currently, our CEO, S. Douglas Hutcheson, is also serving as acting CFO. *The material weakness we have identified in our internal control over financial reporting related to the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenue and deferred revenues, and ineffective testing of changes made to our revenue and billing systems in connection with the introduction or modification of service offerings.*
>
> We have taken and are taking actions to remediate this material weakness. In addition, management has developed and presented to the Audit Committee a plan and timetable for the implementation of remediation measures (to the extent not already implemented), and the committee intends to monitor such implementation. We believe that these actions will remediate the control

deficiencies we have identified and strengthen our internal control over financial reporting.

We previously reported that certain material weaknesses in our internal control over financial reporting existed at various times during the period from September 30, 2004 through September 30, 2007. These material weaknesses included excessive turnover and inadequate staffing levels in our accounting, financial reporting and tax departments, weaknesses in the preparation of our income tax provision, and weaknesses in our application of lease-related accounting principles, fresh-start reporting oversight, and account reconciliation procedures.

Leap Wireless December 31, 2007 Form 10-K, p. 25 (Emphasis added).

153.    Leap's Form 10-K for fiscal year ended December 31, 2007 further disclosed the Company's material weaknesses and deficiencies in internal controls relating to Leap's billing and revenue systems and processes for recording revenue:

Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2007 based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. *In connection with management's assessment of internal control over financial reporting, management identified the following material weakness as of December 31, 2007:*

    •    ***There were deficiencies in our internal controls over the existence, completeness and accuracy of revenues, cost of revenues and deferred revenues. Specifically, the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenues and deferred revenues did not detect the errors in revenues, cost of revenues and deferred revenues. A contributing factor was the ineffective operation of our user acceptance testing (i.e., ineffective testing) of changes made to our revenue and billing systems in connection with the introduction or modification of service offerings.*** This material weakness resulted in the accounting errors which caused us to restate our consolidated financial statements as of and for the years ended December 31, 2006 and 2005 (including interim periods therein), for the period from August 1, 2004 to December 31, 2004 and for the period from January 1, 2004 to July 31, 2004, and

PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT
81

our condensed consolidated financial statements as of and for the quarterly periods ended June 30, 2007 and March 31, 2007. In addition, this material weakness resulted in an adjustment recorded in the three months ended December 31, 2007, which we determined was not material to our previously reported 2006 annual or interim periods. *The material weakness described above could result in a misstatement of revenues, cost of revenues and deferred revenues that would result in a material misstatement to the Company's interim or annual consolidated financial statements that would not be prevented or detected on a timely basis.*

In light of the material weakness described above, and based on the criteria set forth in *Internal Control — Integrated Framework* issued by the COSO, *our management concluded our internal control over financial reporting was not effective as of December 31, 2007.*

The effectiveness of our internal control over financial reporting as of December 31, 2007 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which is included herein.

(c)   Management's Remediation Initiatives

We are in the process of actively addressing and remediating the material weakness in internal control over financial reporting described above. Elements of our remediation plan can only be accomplished over time. We have taken and are taking the following actions to remediate the material weakness described above:

• During the fiscal quarter ended December 31, 2007, we performed a detailed review of our billing and revenue systems, and processes for recording revenue. We also began and continue to implement stronger account reconciliations and analyses surrounding our revenue recording processes which are designed to detect any material errors in the completeness and accuracy of the underlying data.

• We intend to design and implement automated enhancements to our billing and revenue systems to reduce the need for manual processes and estimates and thereby streamline the processes for ensuring revenue is recorded only when payment is received and services are provided.

• We intend to further improve our user acceptance testing related to system changes by ensuring the user acceptance testing encompasses a complete population of scenarios of possible customer activity.

• We intend to hire additional personnel with the appropriate skills, training and experience in the areas of revenue accounting and assurance. We have conducted and will conduct further training of our accounting and finance personnel with respect to our significant accounting policies and procedures.

Management has developed and presented to the Audit Committee a plan and timetable for the implementation of the remediation measures described above (to the extent not already implemented), and the Committee intends to monitor such

implementation. We believe that the actions described above will remediate the material weakness we have identified and strengthen our internal control over financial reporting. As we improve our internal control over financial reporting and implement remediation measures, we may determine to supplement or modify the remediation measures described above.

Leap Wireless December 31, 2007 Form 10-K, p.121-22 (Emphasis added).

## VII.

## ACCOUNTING ALLEGATIONS

**A.  Defendant PwC's Report Falsely Support Reported
2006 Results And Adequacy of Internal Controls**

154.   Defendant PwC issued its report on the 2006 financial statements and the adequacy of management internal controls. PwC stated the 2006 financial statements conformed to GAAP as follows:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of Leap Wireless International, Inc.:

We have completed integrated audits of Leap Wireless International, Inc.'s 2006 and 2005 consolidated financial statements and of its internal control over financial reporting as of December 31, 2006, and an audit of its consolidated financial statements as of and for the five months ended December 31, 2004 in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

*Consolidated Financial Statements*
*In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of cash flows and of stockholders' equity (deficit) present fairly, in all material respects, the financial position of Leap Wireless International,* Inc. and its subsidiaries (Successor Company) at December 31, 2006 and 2005, and the results of their operations and their cash flows for the years ended December 31, 2006 and 2005 and the five months ended December 31, 2004 *in conformity with accounting principles generally accepted in the United States of America.* These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements

includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. *We believe that our audits provide a reasonable basis for our opinion.*

Leap Wireless December 31, 2006 Form 10-K, p. 69 (Emphasis added).

155.    PwC's statements in the preceding paragraph were materially false and misleading.  Leap's financial statements did not conform with GAAP.  First, Leap recognized revenue for customers who terminated their relationships with Leap.  Therefore, since there was not persuasive evidence that a subscriber arrangement existed, Leap's revenue recognition policy did not comply with GAAP.  The use of the term "arrangement" in SAB 104 is meant to identify an understanding between the parties as to the specific nature and terms of the agreed-upon transactions or services to be provided.  *See* SAB 104, fn. 3.  In fact, the understanding was that customers' terminated service, precluding the recognition of revenues.  Second, collectability was not reasonably assured.  As disclosed by Leap in its financial statements, the Company recognizes revenue only after cash is received from its customers.  In cases where the customer terminated the service, cash was not forthcoming.  As a result, Leap recognized revenue in violation of GAAP.  (¶¶ 8-14, 66-72).  As alleged herein, PwC was presented by outside consultants (including CW#3, CW#4 and CW#5), with evidence of improper revenue recognition in connection with its audit of Leap's fiscal year 2006 financial results.  (¶¶ 9, 25, 35-36, 47, 49, 125, 128, 130, 133).  PwC's audits failed detect either of these financial reporting or internal controls issues, thereby opining that the financial statements conformed to GAAP when they were materially misstated.

156.    Defendant PwC further supported Leap's positive assessment of the adequacy of the Company's internal controls by stating as follows:

***Internal Control Over Financial Reporting***

*Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, that the Company maintained effective internal control over financial reporting as of December 31, 2006 based on criteria established in Internal Control —* Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), *is fairly stated, in all material respects, based on those criteria.* Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control — Integrated Framework issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. *We believe that our audit provides a reasonable basis for our opinions.*

*Id.* (Emphasis added).

157.   The PCAOB's Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS No. 2"), establishes requirements and provides directions for an auditor engaged to audit both the financial statements and management's assessment of its internal controls.   The auditor's objective in an audit of internal control over financial reporting is to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting.   Maintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment.

158.    When Leap restated its financial statements it admitted that there were unreported pre-existing material weaknesses that led to the material misstatement of Leap's financial statements.  This restatement is an admission by Leap that its internal controls were not effective and an admission by PwC that it failed to detect the material weaknesses in Leap's internal controls.  The fact that PwC did not detect the material weaknesses in the internal controls over revenue recognition when the CWs provided information to PwC about the revenue recognition errors means that PwC did not adhere to the requirements of AS No. 2.

159.    As set forth below at ¶¶ 160-62, 169-70, 176-84, 187-91, these statements by PwC were materially false and misleading.

**B.    Leap and PwC's Violations of GAAP**

160.    Throughout the Class Period, the Defendants knowingly or recklessly made material false and misleading statements, or omitted material information, relating to Leap's financial results and its compliance with GAAP.  By restating its financial results, the Company admitted that its financial statements were materially false and misleading at the time they were publicly issued.  *See* SFAS 154, SFAS 16 and APB Opinion No. 20 (restatement are only permitted, and are required, for material accounting errors or irregularities that existed at the time the financial statements were prepared).  Indeed, the Company has admitted that the Restatement of its prior financials was "required" and that it would *reduce previously reported fiscal year-end 2006 operating income by approximately 45% and first-half of fiscal 2007 operating income by 29%.*

161.    In point of fact, Leap admitted that "the design of controls over the preparation and review of the account reconciliations and analysis of revenues, cost of revenues and deferred revenues did not detect the errors in revenues, cost of revenues and deferred revenues."  Thus,

Leap failed to establish and maintain accounting and reporting systems and procedures sufficient to reasonably assure that the Company reported financial results in conformity with GAAP.

162.    According to the Restatement, Leap's financial statements were required to be restated on the following grounds: (1) errors arising from materially weak accounting systems and internal controls, including the Company's accounting for customers that who voluntarily discontinued service but for whom Leap continued to accrue and record revenue; (2) errors relating to the time and recognition of certain revenues and operating expenses; and (3) errors relating to the reconciliation of billing system data for pay in arrears customers which resulted in an overstatement of revenue as the number of pay in arrears customers in the Company's customer base experienced a decline in 2006 and the first half of 2007. *See* Leap Wireless Press Release, dated November 9, 2007.

163.    A primary function of PwC, as Leap's auditor, was to assure itself and to confirm to investors that the revenue, operating income and net income purported recognized by Leap actually existed. PwC failed to discharge this responsibility.

164.    At all relevant times during the Class Period, Leap represented that its financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. As set forth in Statement of Financial Accounting Concepts ("SFAC") No. 1, *Objectives of Financial Reporting by Business Enterprises,* one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Paragraph 42 of SFAC No. 1 states as follows:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about

the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

165.    As provided in SEC Rule 4-01 (a) of Regulation S-X, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

166.    Management is responsible for preparing financial statements that conform with GAAP. The PCAOB Professional Standards provide:

> The financial statements are management's responsibility... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AU § 110.03 (1998).

167.    In connection with the audits of Leap's 2006 financial statements, Leap's management made written representations to PwC in which Leap management acknowledged their responsibility for the fair presentation in those financial statements of Leap's financial position, results of operations, and cash flows in conformity with GAAP. AU § 333.06. Similar written management representations were provided by Leap management for each of PwC's reviews of Leap's interim financial statements during 2006 and 2007. AU § 722.13(g).

168.    PwC's independent auditor report was incorporated in Leap's 2006 Form 10-K. PwC's audit report was prepared specifically for distribution to Leap's shareholders. Accordingly, PwC knew or should have known that its clean audit report was material to

investors' decisions to purchase shares of Leap, and that investors placed substantial reliance on PwC's audit report.

169. PwC's audit opinions misrepresented that Leap's financial statements fairly presented the Company's financial position in accordance with GAAP as a result of PwC's failure to make appropriate inquiries and its willful disregard of numerous red flags as alleged herein.

170. PwC willfully, recklessly and/or grossly failed in its stated "responsibility ... to express an opinion on [the Company's] financial statements." PwC misrepresented in its opinions that the Company's financial statements were presented in accordance with GAAP, and that its audit was performed in accordance with GAAS. PwC's work was so deficient that the firm had no basis whatsoever to express legitimately any opinion concerning Leap's financial statements.

## C.   Defendant PwC's GAAS Violations

171. GAAS, as developed by the Auditing Standards Board of the American Institute of Certified Public Accountants and adopted by the PCAOB as its interim standards, governs the conduct of auditors performing and reporting on audit engagements of public entities.

172. PwC represented throughout the Class Period that it performed and reported on its audit engagements with Leap in accordance with GAAS.

173. Ten standards comprise GAAS. These ten standards include three general standards, three standards of fieldwork and four standards of reporting. *See generally* AU §150. During its audit of Leap's financial statements for fiscal year 2006, PwC violated at least six of those standards.

174.    Statements on Auditing Standards ("SAS") are issued from time to time by the PCAOB as interpretations of the ten GAAS standards. The PCAOB Code of Professional Conduct requires that members be prepared to justify departures therefrom. Therefore, SASs, collectively, are the primary authoritative source of GAAS.

175.    The SASs are codified annually by the PCAOB, and sections of the codification, which group these promulgations into topics to facilitate guidance to an auditor with respect to an audit area, are preceded by the letters "AU." During the course of its audits, PwC failed to adhere to many of the SASs.

176.    PwC violated GAAS Standard of Reporting No. 1 in that its audit reports falsely stated that Leap's financial statements were presented in conformity with GAAP.

177.    PwC violated Standard of Reporting No. 3 in that the informative disclosures in Leap's financial statements were not reasonably adequate.

178.    PwC violated Standard of Reporting No. 4 in that it had insufficient basis for expressing a clean "unqualified opinion" on Leap's financial statements as its audits had not been conducted in accordance with GAAS.

179.    PwC violated GAAS Standard of Fieldwork No. 1, AU §311, and SAS No. 99 by, among other things, failing to adequately plan its 2006 audit of Leap and to design procedures to search for and detect the existence of material misstatements caused by error or fraud. SAS 99 directs auditors to presume that improper revenue recognition is a fraud risk. Specifically, SAS 99 states:

> Material misstatements due to fraudulent financial reporting often result from an overstatement of revenues (for example, through premature revenue recognition or recording fictitious revenues) or an understatement of revenues (for example, through improperly shifting revenues to a later period). Therefore, the auditor should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition. [AU §316.41]

180.    Because of the risk of material misstatements relating to fraudulent financial reporting of revenue recognition, SAS 99 requires auditors to consider the unique industry considerations and the specific attributes of the revenue transactions.    Specifically, for revenue transactions which are electronically recorded, SAS 99 directs auditors to test controls to "determine whether they provide assurance that the recorded revenue transactions occurred and are properly recorded."    *See* AU §316.54.    Had Defendant PwC tested these controls and followed up on the information provided to PwC by the CWs, PwC would have discovered that Leap was fraudulently overstating revenue by material amounts. (¶¶ 10-14, 45-49, 50-72).

181.    PwC violated GAAS General Standard No. 3 in that due professional care was not exercised in the performance of its audits and the preparation of its reports.

182.    PwC violated Standard of Fieldwork No. 3 in that it failed to obtain sufficient competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for its opinions regarding the financial statements of Leap under audit.

183.    PwC violated SAS No. 31, which requires that an auditor obtain corroborating information to support the financial statement being audited, including checks, invoices, contracts, minutes of meetings, confirmations and other written representations by knowledgeable people, and other information obtained from independent sources.

184.    PwC violated SAS No. 85, which requires that an auditor not substitute client representations for those auditing procedures necessary to afford a reasonable basis as to the opinion being given on financial statements.

185.    PwC undertook to provide to management and the Audit Committee, at the conclusion of each of its audits, its recommendations designed to help Leap make

1    improvements in its internal controls and operations, and other matters that may come to PwC's

2    attention.

3        186.    Under SAS 61, PwC also was required to communicate various other matters to

4    Leap's Audit Committee, including the methods used by Leap to account for routine daily

5    transactions, the process used by management in formulating particularly sensitive

6    accounting estimates and about the bases for PwC's conclusions regarding the reasonableness of

7    those estimates, audit adjustments that could have a significant effect on Leap's financial

8    reporting process, any disagreements with management about matters that could be significant to

9    Leap's financial statements or PwC's report thereon, and any serious difficulties in dealing with

10   management related to PwC's performance of its audits.

11

12       187.    Although PwC knew that Leap's primary business was to provide cellular phone

13   services to low income and less creditworthy customers, a demographic that results in high-

14   turnover of customers – i.e., customer churn – thus requiring accurate and updated customer

15   billing systems for properly account for revenue, PwC failed to adequately respond to the

16   resulting audit risk in planning and performing its audits.

17

18       188.    PwC failed to properly plan the Leap audit based on its understanding of

19   deficiencies in Leap's internal controls, the absence of meaningful internal audit work,

20   information gained from the internal audit work PwC performed for Leap, and its finding that in

21   prior years' audits Leap had exhibited material weakness in its internal control over financial

22   reporting: specifically in its application of GAAP in complex and non-routine transactions and

23   in its accounting for income taxes. PwC failed to respond to the audit risks by planning and

24   then performing audit procedures necessary in the circumstances that would have provided it

25   with reasonable assurance that Leap had not improperly recognized revenue in fiscal year

26

27

28

ended December 31, 2006 and the first half of fiscal year 2007. Furthermore, the procedures it did perform were either ineffective or not performed as planned.

189.    Leap lacked appropriate practices, procedures, and personnel to ensure that standard, routine transactions were accounted for properly, or Leap's internal control structure was inadequate to assure investors of the accuracy of the Company's published financial information.

190.    PwC failed to adequately perform substantive tests of Leap's customer billing system despite its knowledge that high customer turnover is an inherent characteristic in Leap's target and intended market.

191.    PwC further violated professional standards by failing to perform its review of Leap's interim quarterly financial reports for fiscal year 2006 and the first two quarters of 2007 in accordance with professional standards for such reviews.

## VIII.

## UNDISCLOSED ADVERSE FACTS

192.    The market for Leap securities was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose, Leap securities traded at artificially inflated prices during the Class Period. The artificial inflation continued until Leap announced it would be forced to restate its financial results going back to fiscal year 2004.   Plaintiff and other members of the Class purchased or otherwise acquired Leap securities relying upon the integrity of the market price of Leap securities and market information relating to the Company and have been damaged thereby.

193.    During the Class Period, the Defendants materially misled the investing public, thereby inflating the price of Leap securities, by publicly issuing false and misleading statements

and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

194. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Leap's business, accounting and financial results. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Leap and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## IX.

## ADDITIONAL SCIENTER ALLEGATIONS

195. As alleged herein at ¶¶ 21-37, Defendants acted with scienter in that Defendants had knowledge and/or were deliberately reckless to the fact that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities

laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Leap, their control over, and/or receipt and/or modification of Leap's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Leap, participated in the fraudulent scheme alleged herein.

196.    Defendants knew or were deliberately reckless as to the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

197.    The Individual Defendants' scienter is also reflected in the motivation to profit from insider sales. After coming out of bankruptcy and during the Class Period, the Individual Defendants, in addition to their salary and bonus compensation, amassed an enormous number of stock options, exercisable at future dates. During the Class Period, the "positive" earnings performance presented to analysts inflated Leap's common stock, which then drove stock prices to the mid- to high-$80.00 per share range. Contrary to what investors were told, the Individual Defendants, with full knowledge that the Company's lack of internal controls contributed to inaccurate and materially false and misleading financial reports in violation of GAAP, including overstatement of revenue and operating income for customers that had voluntarily discontinued service, unprecedentedly sought to unload substantial portions of their Leap holdings. Prior to the announcement of the Restatement, the Individual Defendants exercised stock options in size and frequency that had not occurred in preceding years, and liquidated substantial portions of their holdings in Leap common stock at these artificially inflated prices:

**DEFENDANT HUTCHESON'S CLASS PERIOD STOCK SALES**

| Transaction Date | Amount | Price | Proceeds from Sale |
|---|---|---|---|
| 2/27/2007 | 625 | $ 67.32 | $42,073.31 |
| 2/27/2007 | 6,277 | $ 67.32 | $422,550.69 |
| 5/23/2007 | 17,021 | $ 85.61 | $1,457,161.00 |
| | 23,923 | | $1,921,785.01 |

**DEFENDANT TARGOFF'S CLASS PERIOD STOCK SALES**

| Transaction Date | Amount | Price | Proceeds from Sale |
|---|---|---|---|
| 6/6/2007 | 35,000 | $ 83.52 | $2,923,291.00 |

**DEFENDANT BURTON'S CLASS PERIOD STOCK SALES**

| Transaction Date | Amount | Price | Proceeds from Sale |
|---|---|---|---|
| 2/27/2007 | 665 | $ 67.32 | $44,766.00 |

**GLENN UMETSU'S CLASS PERIOD STOCK SALES**

| Transaction Date | Amount | Price | Proceeds from Sale |
|---|---|---|---|
| 2/27/2007 | 7,388 | $ 67.32 | $497,340.21 |
| 2/27/2007 | 7,388 | $ 67.32 | $497,340.21 |
| 2/28/2007 | 8,212 | $ 67.32 | $552,809.67 |
| 2/28/2007 | 8,212 | $ 67.32 | $552,809.67 |
| 3/27/2007 | 738 | $ 67.23 | $49,612.12 |
| 3/27/2007 | 821 | $ 67.23 | $55,191.81 |
| 4/27/2007 | 738 | $ 79.10 | $58,375.80 |
| 4/27/2007 | 821 | $ 79.10 | $64,941.10 |
| 5/24/2007 | 738 | $ 84.24 | $62,169.93 |
| 5/24/2007 | 821 | $ 84.24 | $69,161.94 |
| 5/29/2007 | 1,478 | $ 82.84 | $122,443.14 |
| 5/29/2007 | 1,643 | $ 82.84 | $136,112.36 |
| 6/27/2007 | 1,643 | $ 81.69 | $134,224.39 |
| 6/27/2007 | 1,478 | $ 81.69 | $120,744.77 |
| 7/27/2007 | 2,464 | $ 88.34 | $217,665.08 |
| 7/27/2007 | 2,218 | $ 88.34 | $195,933.91 |
| | 46,801 | | $3,386,876.11 |

### DONDERO'S CLASS PERIOD STOCK SALES

| Transaction Date | Amount | Price | Proceeds from Sale |
|---|---|---|---|
| 5/23/2007 | 90,000 | $ 85.68 | $7,710,930.00 |
| 5/24/2007 | 3,000 | $ 85.18 | $255,525.30 |
| 5/30/2007 | 200,000 | $ 84.89 | $16,978,480.00 |
| 6/6/2007 | 85,000 | $ 83.52 | $7,099,531.50 |
| 6/7/2007 | 75,000 | $ 83.29 | $6,246,915.00 |
| 6/8/2007 | 140,000 | $ 83.93 | $11,750,676.00 |
| 6/11/2007 | 40,000 | $ 85.45 | $3,418,104.00 |
| | 633,000 | | $53,460,161.80 |

198.    Defendants were also substantially motivated to issue materially false and misleading statements in order to increase the bonus and stock option compensation obtained during the Class Period as a result of inflated financial results and Leap's common stock price. As stated in Leap's 2007 Proxy Statement, filed with the SEC on April 6, 2007, the Company "believ[ed] that compensation paid to executive officers should be closely aligned with our performance." To achieve this, Leap set corporate performance goals for the Company that if reached would compensate its executive officers, *i.e.*, the Management Defendants. The corporate performance goal "focused primarily on (1) a financial measure we call adjusted OIBDA (operating income before depreciation and amortization) ... and (2) net customer additions." 2007 Proxy, p. 24. In addition, each executive officer worked with Hutcheson to establish individual performance goals based on their role with the Company. *Id.* As stated in the 2007 Proxy, individual performance goals established for Leap's executive officers in 2006 included, for example:

> the acquisition and build-out of certain designated wireless spectrum and/or markets, ***the improvement of our internal control over financial reporting, the retention and expansion of our customer base***, ...

*Id.* at 25 (Emphasis added). In fact, the 2007 Proxy stated that the bonuses paid to the Management Defendants under the 2006 Bonus Plan were based 75% on Leap's achievement of

corporate performance goals and 25% on the individual officer's performance throughout the year. *Id.* In addition, Leap granted to its executives – including the Management Defendants – non-qualified stock options, subject to accelerated performance-based vesting if Leap met certain performance targets – including adjusted earnings before taxes, interest, depreciation and amortization ("EBITDA") and net customer additions. Most significantly, the Management Defendants motivation for issuing the materially false and misleading statements is further evidenced by the accelerated vesting of stock options in February 2007 (while Leap's common stock was trading at artificially inflated prices), as set forth in the 2007 Proxy:

> In 2005, there was no acceleration of vesting, but ***vesting of a portion of these awards was accelerated in February 2007 in connection with Leap's 2006 performance, based on the levels of adjusted EBITDA and net customer additions achieved by Leap***. The acceleration of vesting relating to 2006 applied to 19.3% of the shares underlying such award, other than vesting for Mr. Hutcheson, whose agreements provided for 20% performance-based vesting.

*Id.* at 26-27 (Emphasis added).

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE FRAUD-ON-THE-MARKET DOCTRINE

199.    At all relevant times, the market for Leap securities was an efficient market for the following reasons, among others:

(a)    Leap securities met the requirements for listing, and was listed and actively traded on the NASDAQ and OTC markets, a highly efficient market;

(b)    As a regulated issuer, Leap filed periodic public reports with the SEC and the NASDAQ and OTC markets;

(c)    Leap regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d)     Leap was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

200.    As a result of the foregoing, the market for Leap securities promptly digested current information regarding the Company from all publicly-available sources and reflected such information in Leap common stock price.  Under these circumstances, all purchasers of Leap securities during the Class Period suffered similar injury through their purchase of Leap securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

201.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors which could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Leap who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act Against
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

202.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

203.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Leap securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

204.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Leap securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

205.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Leap as specified herein.

206.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of Leap's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Leap and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Leap securities during the Class Period.

207.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarly with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

208.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such

PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT
101

Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Leap's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

209.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Leap securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Leap's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Leap securities during the Class Period at artificially high prices and were damaged when the true facts were revealed and the price of Leap's common stock plunged.

210.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Leap was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Leap securities, or, if they had

acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

211.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

212.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of The Exchange
### Act Against the Individual Defendants

213.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

214.   The Individual Defendants acted as controlling persons of Leap within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

216.   As set forth above, Leap and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:          July 7, 2008                    **GLANCY BINKOW & GOLDBERG LLP**


By: _____
            Lionel Z. Glancy, Esq.
Andy Sohrn, Esq.
1801 Ave. of the Stars, Suite 311
Los Angeles, CA, 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160

*Liaison Counsel*

**SCHOENGOLD SPORN LAITMAN
& LOMETTI, P.C.**
Samuel P. Sporn (SS-4444)
Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Jay P. Saltzman (JS-7335)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, New York 10038
Tel.: (212) 964-0046
Fax: (212) 267-8137

*Lead Counsel for the Class
and Attorneys for the Lead Plaintiff
New Jersey Carpenters Pension and
Benefit Funds*

## PROOF OF SERVICE BY ELECTRONIC MAIL

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California 90067.

On July 7, 2008, I served the following:

**1. AMENDED SUMMONS IN A CIVIL ACTION**
**2. PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

on the parties shown below by e-mailing a true copy thereof to the addresses of the parties as listed on the ECF website in 07-CV-2245 (BTM).

Ramzi Abadou
ramzia@csgrr.com

Kimberly Arouh Hicks
kimberly.hicks@lw.com,daniel.greene@lw.com,curtis.carll@lw.com,jake.ryan@lw.com,alethia.corneil@lw.com,laurie.holman@lw.com,tess.medina@lw.com

Lori Sambol Brody
lbrody@kaplanfox.com,ldannunzio@kaplanfox.com

Blake M Harper
bmh@hulettharper.com,office@hulettharper.com

Kirk B Hulett
kbh@hulettharper.com,office@hulettharper.com

Nicole Lavallee
nlavallee@bermanesq.com,stuiasosopo@bermanesq.com

Christopher Lometti
chris@spornlaw.com

Jay Saltzman
jay@spornlaw.com,jps062@aol.com

Diane Marie Walters
dwalters@wsgr.com,smills@wsgr.com

Executed on July 7, 2008, at Los Angeles, California.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Tia Reiss